HON. WILLIAM F. KUNTZ, II, UNITED STATES DISTRICT JUDGE
On July 3, 2014, a unanimous jury found petitioner/defendant Mohammad Ajmal Choudhry ("Petitioner") guilty of conspiracy to commit murder in a foreign country, fraud and misuse of a petition for an alien relative, and transmission of threats to injure. On May 7, 2015, this Court sentenced Petitioner to life imprisonment. Before the Court are (1) Petitioner's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, and (2) Petitioner's petition to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. For the reasons that follow, both of Petitioner's motions are DENIED.
BACKGROUND
I. The Charges and Offense Conduct
On June 6, 2014, the United States filed a superseding indictment charging Petitioner with (1) conspiracy to commit murder in a foreign country, in violation of 18 U.S.C. §§ 956(a)(1) and 956(a)(2)(A) ; (2) fraud and misuse of petition for an alien relative, in violation of 18 U.S.C. § 1546(a) ; and (3) transmission of threats to injure, in violation of 18 U.S.C. § 875(c). Superseding Indictment (S-2), ECF No. 77. The charges were filed following Petitioner's arrest on February 25, 2013, in Brooklyn, New York, and stem from the murder of two individuals in Pakistan, Muhammad Asghar ("Asghar") and Madeeha Asghar ("Madeeha"), the father and sister, respectively, of Shujat Abbas ("Shujat"), the forbidden love interest of Petitioner's youngest daughter, Amina Ajmal ("Amina"). Gov't Memo in Opp. to Petitioner's Rule 33 Mot. and 2255 Pet. ("Gov't Opp.") at 3, ECF No. 136; Petitioner's Memo in Supp. of Rule 33 Mot. (" Rule 33 Mot.") at 1-2, ECF No. 124; Petitioner's Memo in Supp, *829 of 2255 Pet. ("2255 Pet.") at 3-4, ECF No. 127.
Amina was born in 1990 in Chiryawala, Pakistan. Trial Transcript ("Tr.") at 435, ECF Nos. 94-98 & 102-04. In 1999, when she was nine years old, Amina moved to Brooklyn, New York, to live with her father. Id. at 435-37. She became a United States citizen in 2009. Id. at 453. In approximately 2001, Amina learned her father had arranged for her to marry Abrar Ahmed Babar ("Babar"), Amina's cousin who lived in Pakistan. Id. at 454. In approximately 2007, Amina met Shujat while visiting Pakistan to attend her sister's wedding, and she continued to communicate with him after returning to Brooklyn. Id. at 470-75. Amina kept her communications with Shujat a secret because she believed her father would not approve of her communicating with him. Id. at 475. In approximately 2008, Amina told her father she wanted to marry Shujat, not Babar, and Petitioner initially indicated that he would make arrangements for Amina to marry Shujat. Id. at 476-78, 481-82.
In December 2009, Amina traveled with Petitioner to Pakistan to attend her cousin's wedding. Id. at 481-82. When they were in Pakistan, Petitioner told Amina she was "too Americanized" and would remain in Pakistan for some time, and she lived in her family's home in Chiryawala while her father returned to the United States. Id. at 483-85. While she was living in Pakistan with her family, Amina's Uncle Akmal ("Akmal")-Petitioner's brother-learned Amina had been continuing to speak in secret with Shujat, and Akmal told her she must marry Babar. Id. at 485-500. When Amina refused, Akmal went to get a gun and threatened to kill her. Id. at 500-01. Petitioner also threatened Amina in telephone calls, stating "I don't want to hear any more complaints from you or about you, and I will kill you if you do anything wrong now." Id. at 502-03.
Amina learned of the date on which she was supposed to marry Babar two days before the "nikkah" ceremony.[1] Id. at 513. When Amina expressed her desire not to marry Babar, Akmal threatened to kill her, and Akmal also told Amina her father had given him permission to kill her if she did not marry Babar. Id. 513-16. Amina went forward with the nikkah and eight months later had a wedding celebration and subsequently moved in with Babar's family in November 2012. Id. at 517-21. Amina was not allowed to return to the United States even after her wedding celebration was over. Id. at 543.
In January 2013, with the assistance of Shujat and the United States Consulate in Pakistan, Amina planned and executed an escape to the United States. Id. at 544-55. Once in the United States, Amina contacted law enforcement officials because, as Amina explained, "[m]y family was threatening Shujat's family, and I wanted them to prevent that." Id. at 558-59. Amina explained her act of leaving Pakistan "dishonored" her family. Id. at 557-58.
Amina's concerns regarding the safety of Shujat's family members were well-founded. In January 2013, Akmal fired a gun at Asghar and his wife, Rukhsana Kousar ("Rukhsana"), when they were in their car driving back to Chiryawala. Id. at 732, 737-41. Rukhsana testified she saw other members of Amina's family at the scene of the shooting, as well as Babar. Id. at 740-42. Rukhsana testified Akmal and Amina's other family members at the scene were holding firearms. Id. at 820-21. Asghar and Rukhsana were able to escape unharmed. Id. at 744-45. However, Amina's family members continued to threaten Shujat's family, including during a phone *830 call between Asghar and an individual who Seemab Asghar ("Seemab"), Shujat's sister, and Rukhsana believed to be Petitioner. In that call, the individual they believed to be Petitioner told Asghar, "[i]f our daughter will not come back to the home, we will kill all five of you, otherwise we will find your son and we'll kill him .... This time, we shoot on your car. It was threatening, but next time we will shoot in the chest of all five of you." Id. at 128-30, 752-54.
On February 25, 2013, Asghar received a telephone call directing him to go to the home of a political leader. Id. at 770-71. Rukhsana testified that she went to meet Seemab after school at a bus stop, which is approximately a thirty-minute walk from her house, and arrived at the stop at around 1:35 P.M. Id. at 772. While Rukhsana and Seemab were walking home, they saw Asghar and Madeeha riding on a motorcycle driven by Zameer Abbas ("Zameer"), a relative who was living with their family at the time and driving them around, heading towards their home. Id. at 152-53, 223-24, 773-74. Seemab and Rukhsana testified they heard gunfire when they were approximately one block away from their home. Id. at 153-54, 774-75.
Rukhsana testified she and Seemab ran towards the area where they heard the gunfire, and upon arriving, "[she] saw that [her] husband's dead body was laying down." Id. at 776. She testified Madeeha's body was on the street surrounded by Akmal, Babar, Nisar (Babar's father), and Sain Ashfaq ("Ashfaq") (who worked for Mohammad Afzal Choudhry ("Afzal"), Petitioner's brother, and lived in his house). Id. at 57-58, 779. Rukhsana testified she saw other individuals at the scene, including Javed Iqbal (a relative of Petitioner, see, e.g., id. at 1293), Mazhar Iqbal (Javed's cousin, see, e.g., id. at 442), Ehsan Ullah, and Shahid Iqbal (Javed's brother). Id. at 781-82.
Rukhsana testified Akmal had a gun in his hand and he was hitting Madeeha's body with it, and the other men also had guns and were kicking Madeeha. Id. at 776-77, 780-81. Rukhsana testified that Akmal pointed his gun at her and Seemab and said, "they are here, don't let them go and they're here to cry."Id. at 776-77, 787. Rukhsana and Seemab then fled. Id. at 787.
Seemab similarly testified that on February 25, 2013, she met her mother at the bus stop after school at approximately 1:35 P.M., and she started to walk home with her mother when she saw her father and sister, Madeeha, on a motorbike. Id. at 149-52. Seemab testified that when they were close to home, they heard gunfire. Id. at 153. Seemab testified she and her mother, Rukhsana, ran towards the sound of the gunfire. Id. at 154-55. Seemab testified she saw "[her] father's dead body on the ground," and she saw Akmal, Nisar, Babar, and Ashfaq standing around her sister, whose body was on a drain. Id. at 157-58. She testified Madeeha's feet were shaking and Akmal, Nisar, Babar, and Ashfaq were kicking Madeeha's body. Id. at 159. Seemab testified that all four men had guns in their hands, and Akmal said, "[t]hey talk a lot against our family, now I'm taking revenge." Id. at 161. Seemab testified when the men saw her and her mother, they said, "don't let them go, kill them." Id. at 162. Seemab testified that she and her mother fled the scene. Id.
II. Additional Evidence Presented During Trial
In addition to the testimony described above, the jury heard other evidence implicating Petitioner in the murders of Asghar and Madeeha. Specifically, the Government introduced into evidence six recorded telephone calls between Amina and Petitioner, which were recorded by the Department *831 of Homeland Security with Amina's consent between February 15, 2013 and February 25, 2013 (the day of the murders). Gov't Opp. at 10-14; Gov't Trial Exs. 101-106, collectively attached as Ex. C to Gov't Opp. ("Gov't Ex. C"), ECF No. 136-3. In those calls, Petitioner made a number of threats regarding Shujat's family. Among other statements, Petitioner said, "[u]ntil I find you [Amina] ... I won't stop ... I'm going to kill their whole family." Gov't Ex. C at 10 (ECF pagination). Petitioner also stated, "I will keep shooting at them, until you come back home ... I will kill myself and also make sure I kill all of them."[2] Id. at 11. In the final call, recorded shortly after the killings on February 25, 2013, Petitioner denied being involved in the killings but also made statements appearing to inculpate himself in the murders; for example, in response to Amina's accusation that Petitioner was involved, Petitioner stated:
I am not going to spare anyone. I swore on your mother, but you didn't respect it. But I swear on my mother now and will keep that promise. I will not leave a single member of their family alive. My name is tainted everywhere in newspapers, on TV channels, that I am a man with no honor, my daughters are whores ... [PAUSE] I have no place to show my face with dignity ... [PAUSE] ... you still have time. Think about it. In the next 24 hours, call me, wherever you are. If you are close by, I will come pick you up. If you are far away, I will send you airfare. Come back home.
Id. at 51. Petitioner explicitly acknowledged having threatened Shujat's family, stating: "Oh, we have to threaten them ... in order to have them bring you back to us. There is no doubt we threatened them." Id. at 47.
Homeland Security agents also uncovered evidence that Petitioner had mailed a falsified immigration petition naming Amina as the petitioner and Babar as the beneficiary. Gov't Opp. at 14-15; Tr. at 296-97, 367-70. The immigration petition, dated December 1, 2012, was mailed from 817 Foster Avenue in Brooklyn, New York, which Amina testified is Petitioner's address. Tr. at 369, 542. The petition indicated Amina was living at 817 Foster Avenue when the petition was completed and sent to the government, but Amina testified she was living in Pakistan as of December 1, 2012. Id. at 370, 540. Amina also testified she did not complete any immigration paperwork for Babar while she was in Pakistan. Id. at 537.
The Government called Matthew Maguire from the U.S. Diplomatic Security Service of the Department of State as a witness. Id. at 921-22. He testified he took part in arresting Petitioner on February 25, 2013. Id. at 923. He testified that after Petitioner was read his rights, he initially asked to speak with a lawyer, but then Petitioner "began spontaneously speaking about the case." Id. at 933-36. Agent Maguire testified Petitioner made several statements, including (1) Petitioner was upset Amina had not returned to the family home in Brooklyn; (2) Petitioner filed the visa petition mentioned above; (3) Petitioner "may have said he would kill the boy, which [Agent Maguire] understood to mean Shujat Abbas"; and (4) Petitioner's brother Akmal "might have been at the scene of the murders in Pakistan earlier that day." Id. at 937-38.
The Government introduced additional evidence of Petitioner's phone, financial, and work records further implicating him in the murders. Gov't Opp. at 15-16. These *832 records indicated that during the two days leading up to the January 2013 shooting incident described earlier, Petitioner's cell phone was in contact with Pakistani phone numbers identified as being used by "Ak," "Akmal," and "Javed." Id. at 15-16 (citing Tr. at 720, 1032-33). An employee of Western Union Financial Services Incorporated testified that on February 5, 2013, someone who presented himself as Mohammad Choudhry with an address of 817 Foster Avenue in Brooklyn, New York sent $900.00 to a person presenting himself as Mohammad Akmal, and the money was picked up the following day in Karachi, Pakistan. Tr. at 423. Homeland Security Investigations Special Agent Danny Lee testified that on February 24, 2013, at 10:09 P.M., Petitioner received a call from a Pakistani telephone number used by Nisar or Babar that lasted more than nine minutes, and between 10:32 P.M. on February 24, 2013, when Petitioner finished his shift as a taxi driver,[3] and the corresponding time of approximately 2:30 P.M. in Pakistan on February 25, 2013-the approximate time of the murders, see, e.g., id. at 809-Petitioner made or received thirty-nine phone calls. Id. at 1046, 1048-49. Special Agent Lee testified that over the course of the hours leading up to and after the time of the murders, he identified Petitioner as having contact with several Pakistani numbers, including numbers of individuals identified as Nisar or Babar, AK, Javed, Mazhar, and Ashfaq. Id. at 1049-53.
The defense called three witnesses during trial. Rule 33 Mot. at 4; 2255 Pet. at 8-9. Waqas Ali, a policeman, testified that on February 25, 2013, he was working at the Chiryawala traffic "check post" when he was instructed to leave his post and rush to the location of the shooting. Tr. at 1306-08. He testified that upon arriving at the scene, he observed "a wounded man and a woman ... on the street, on the ground." Id. at 1309. He testified that pursuant to instructions from a supervising officer, he proceeded to pick up Seemab from a bus stop on her way home from school and brought her to the scene of the shooting. Id. at 1312-13. Another defense witness, Manzoor Ahmed ("Manzoor"), who operated a private van in which he drove students to and from nearby schools, testified that on February 25, 2013, he picked Seemab up from school in his van at approximately 2:00 P.M. Id. at 1272-75. He testified he received a phone call from a police officer on the way to Chiryawala who told him not to "hand over" Seemab to anyone, "[e]ven if somebody asks for [her]." Id. at 1275-77. Manzoor testified he arrived in Chiryawala at about 3:15 P.M. that afternoon and handed Seemab over to police officers, as he had been instructed to do. Id. at 1277, 1281-82.
Nazia Khanum ("Nazia"), a teacher from Chiryawala whose testimony was read into the record pursuant to Rule 15 of the Federal Rules of Criminal Procedure, id. at 1153-54, testified that on the afternoon of February 25, 2013, she was walking home when she saw Asghar, Madeeha, and Zameer riding aboard a motorcycle and soon thereafter heard gunfire. Id. at 1158-62. Nazia testified she looked in the direction of the gunfire and saw two men with guns and saw Asghar and Madeeha "on the floor." Id. at 1162-63. Nazia testified she did not see Rukhsana, Seemab, Akmal, or Nisar at the scene of the shooting, all of whom she knew. Id. at 1157-58, 1165-66. She testified the two men who did the shooting were "unknowns" and she *833 "had never seen them in [her] life." Id. at 1166.
III. Conviction and Sentence
On July 3, 2014, a unanimous jury found Petitioner guilty on all three counts of the Superseding Indictment. Jury Verdict, ECF No. 93; July 3, 2014 Minute Entry. On May 7, 2015, this Court sentenced Petitioner to: (1) life imprisonment on Count One, conspiracy to commit murder in a foreign country in violation of 18 U.S.C. §§ 956(a)(1) and 956(a)(2)(A) ; (2) time served on Count Two, fraud and misuse of petition for an alien relative in violation of 18 U.S.C. § 1546(a) ; and (3) twenty-four months imprisonment on Count Three, transmission of threats to injure in violation of 18 U.S.C. § 875(c). Judgment, ECF No. 114.
IV. Direct Appeal
Petitioner appealed his conviction and sentence to the Second Circuit. See United States v. Choudhry , 649 F. App'x 60 (2d Cir. 2016) ; Notice of Appeal, ECF No. 116. On appeal, Petitioner made the following arguments: (1) he was denied a fair trial because of purported bias displayed by this Court and because certain exculpatory evidence was not introduced; (2) this Court erroneously overruled his hearsay objections; (3) this Court's jury instruction regarding the charge for transmission of a threat to injure was erroneous; (4) the evidence was insufficient as a matter of law to support Petitioner's convictions; and (5) this Court erred by giving an uncalled witness jury charge. Choudhry , 649 F. App'x at 60. On May 20, 2016, the Second Circuit rejected Petitioner's arguments and affirmed the judgment of this Court. Id. at 63.
V. Petitioner's Instant Motions
On June 30, 2017, Petitioner filed (1) a motion for a new trial based on newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33, see ECF No. 122 (notice of motion); ECF No. 123 (supporting documents); ECF No. 124 (memorandum in support), and (2) a petition to vacate his sentence and conviction based on ineffective assistance of counsel pursuant to 28 U.S.C. § 2255, see ECF No. 125 (notice of motion); ECF No. 126 (supporting documents); ECF No. 127 (memorandum in support). On August 21, 2017, pursuant to this Court's July 5, 2017 Order to Show Cause, ECF No. 128, Frederick L. Sosinsky, Petitioner's trial counsel, filed a Declaration of Trial Counsel responding to the allegations of ineffective assistance of counsel. Sosinsky Decl., ECF No. 131-1. On December 18, 2017, the Government filed its memorandum in opposition to both of Petitioner's motions, which included the declaration of Ying Stafford ("Stafford Decl"), Petitioner's appellate counsel, attached thereto as Exhibit B. Gov't Opp., ECF No. 136. On February 15, 2018, Petitioner filed a reply memorandum and supporting documents in further support of both of his motions. Reply Memo, ECF No. 140.
In Petitioner's Rule 33 motion, Petitioner argues that newly-discovered evidence warrants a new trial. As described in detail infra and in Petitioner's motion, Petitioner argues this newly-discovered information consists of (1) "information disclosed at trials conducted in Pakistan in Fall 2014 (after Mr. Choudhry's U.S. trial had concluded), and in which persons accused of direct participation in the February 25, 2013 murder of Mohammad Asghar and Madeeha Asghar were acquitted of all charges," and (2) "a Declaration by Amina Ajmal, an important prosecution witness (and Mr. Choudhry's daughter), in which she identifies false testimony by vital prosecution witnesses Seemab Asghar and Rukhsana Kousar." Rule 33 Mot. at 4-5.
In Petitioner's § 2255 petition, Petitioner argues he was deprived of his Sixth *834 Amendment right to the effective assistance of both trial and appellate counsel. 2255 Pet. at 1. Specifically, Petitioner argues his trial counsel was ineffective because trial counsel failed to (1) introduce certain exculpatory evidence; (2) object to inadmissible hearsay and other improper testimony; (3) adequately cross-examine certain Government witnesses; and (4) object to an erroneous jury charge with respect to Count Three. Id. Petitioner argues his appellate counsel was ineffective "because she failed to raise multiple meritorious issues and instead interposed numerous frivolous claims on appeal, failed to apply the proper legal standard to certain issues, and failed to file a Reply Brief." Id.
DISCUSSION
I. Rule 33 Motion
A. Legal Standard
Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial based on newly discovered evidence "must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). "It is well settled that motions for new trials are not favored and should be granted only with great caution." United States v. Costello , 255 F.2d 876, 879 (2d Cir. 1958). "A district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only 'in the most extraordinary circumstances .' " United States v. Imran , 964 F.2d 1313, 1318 (2d Cir. 1992) (quoting United States v. DiPaolo , 835 F.2d 46, 49 (2d Cir. 1987) ).
"Among other things, the defendant must show that the new evidence 'would probably lead to an acquittal.' " Id. (quoting United States v. Gilbert , 668 F.2d 94, 96 (2d Cir. 1981) ). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson , 246 F.3d 129, 134 (2d Cir. 2001) (citation omitted). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." United States v. McCourty , 562 F.3d 458, 475 (2d Cir. 2009) (quotation marks and citations omitted). The Second Circuit's standard for Rule 33 motions based on newly discovered evidence requires that: "(1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." United States v. Owen , 500 F.3d 83, 88 (2d Cir. 2007) (citations omitted); United States v. Forbes , 790 F.3d 403, 406-07 (2d Cir. 2015) ; see also United States v. Gambino , 59 F.3d 353, 364 (2d Cir. 1995) ("Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict." (citation omitted) ).[4]
*835 B. The Alleged Newly Discovered Evidence
Petitioner describes two sources of alleged newly discovered evidence: (1) evidence from trials conducted in Pakistan in 2014, and (2) a declaration of Amina, who contacted Petitioner's counsel "to notify him of false testimony by vital prosecution witnesses Seemab Asghar and Rukhsana Kousar." Rule 33 Mot. at 9.
1. Evidence From 2014 Proceedings in Pakistan
Petitioner points to multiple pieces of evidence he alleges were discovered during proceedings in Pakistan that took place in the fall of 2014, after Petitioner's trial.
First , Petitioner directs the Court to a document titled "Report Zimni," which was allegedly prepared in connection with the trials of Akmal and Babar in Pakistan charging them with the murders of Asghar and Madeeha, and lists a "Date And Place Of Proceeding" of October 29, 2014. Rule 33 Mot. at 5; Ex. 1 ("Report Zimni") to the Decl. of Joshua Dratel in Supp. of Rule 33 Mot. ("Dratel Rule 33 Decl."), ECF No. 123-1. The report was prepared by Shahzad Ahmad, who is noted on the report as a "Sub-Inspector (S.I)/Investigating Officer." Rule 33 Mot. at 5; Report Zimni at 1. Petitioner argues that statements from multiple witnesses in that report "would have convincingly contradicted the testimony of both Seemab Asghar and Rukhsana Kousar, both of whom insisted that Muhammad Akmal and Abrar Ahmad Babar, among others, were present at and participated in the slayings." Rule 33 Mot. at 6-7 (footnote omitted).
Specifically, Petitioner points to paragraph five of the Report Zimni, which "states that seven different persons provided information that, contrary to the government's theory at trial here (and the testimony of the government's witnesses), neither Muhammad Akmal nor Abrar Ahmad Babar were at the scene of the killings, but in fact were elsewhere at the time they occurred." Id. at 5 (citing Report Zimni ¶ 5). According to the Report Zimni, those individuals are "Muhammad Afzal s/o Muhammad Ashraf, Amanat Ali s/o Sardar Khan, Abdul Aziz s/o Bahadar Khan, Ghulam Hussain s/o Allah Ditta, Abdul Khaliq s/o Fateh Muhammad, Muhammad Aslam s/o Rehmat Khan, [and] Azhar Iqbal s/o Faiz Alimad." Report Zimni ¶ 5. According to the Report Zimni, these individuals stated "at the time of [the] alleged occurrence," Akmal was at his cattle farm, and Babar "was present at Chak no. 115/EB, Arifwala." Id.
Regarding Babar's whereabouts at the time of the killings, Petitioner also points to paragraph seven of the Report Zimni, which states Babar "was gone to his uncle[']s home namely Fiaz Ahmed s/o Muhammad Khan on 16.01.2013 at Chak no. 115 E/B, Tehsil Arifwala, District Pakpatan, to look after his agricultural land and stayed there about 08 months." Id. ¶ 7; Rule 33 Mot. at 6. Paragraph seven lists the names of seven additional individuals who could allegedly verify Babar's whereabouts during this time. Report Zimni ¶ 7. Petitioner also directs the Court's attention to cell site information discussed in paragraph seven which, according to Petitioner, establishes "Mr. Babar's location hundreds of miles from the location of the incident."[5] Rule 33 Mot. at 6 (citing Report *836 Zimni ¶ 7).
Second , Petitioner argues "an October 2, 2014 [o]rder on a bail application made in the Pakistani courts by Muhammad Ashfaq, another person alleged by Ms. Asghar and Ms. Kousar to have been present at and participated in the killings, mentions that Mr. Ashfaq had been 'sent to judicial lock up for his trial.' " Id. at 7 (citing and quoting Ex. 2 to Dratel Rule 33 Decl., ECF No. 123-2). According to Petitioner, "[t]hat information - that Mr. Ashfaq had been denied bail pending trial - would have been extremely useful in countering the subtext of the government's claim that Mr. Choudhry's family was sufficiently powerful politically in Pakistan that any witnesses exculpating him or the others alleged to have been involved could not be trusted, and that his family controlled the investigation by authorities in Pakistan." Id. (citations omitted).
Third , Petitioner argues testimony related to a document prepared in connection with the Pakistani trial of Mazhar Iqbal, Ashfaq's co-defendant, "would have undermined Seemab Asghar's testimony at Mr. Choudhry's trial with respect to the location of her sister, Madeeha, in the street after she had been killed, and thereby have cast persuasive doubt on Seemab Asghar's account that she and her mother (Rukhsana Kousar) had come upon the bodies while their assailants were still present."[6] Id. at 8 (citation omitted). The document in question, which Petitioner describes as a summary of the proceedings prepared by the presiding judge, allegedly discusses the testimony of the "draftsman who created the sketch of the location at which Ms. Asghar and his daughter were killed," and states in relevant part that there are drains on both sides of the street, not a drain in the middle of the street. Id. at 7 (citing Ex. 3 to Dratel Rule 33 Decl., ECF No. 123-3). Petitioner further argues that page ten of this document, which states in relevant part that Asghar "had his enmity with different people" and "[i]t is correct that Mohammad Afzal etc. have their political rivalry and enmity with influential persons," ECF No. 123-3 at 10 (ECF pagination), "would have corroborated the defense position that Mr. Asghar had multiple enemies, any of whom could have been responsible for his death, and would have also provided evidence that political rivalries in Pakistan could have accounted for the false accusations against Mr. Choudhry and other members of his family in Pakistan (all of whom were ultimately exonerated prior to trial or acquitted thereat)." Rule 33 Mot. at 8.
2. Amina's Declaration
Petitioner's counsel, Mr. Dratel, states Amina contacted him in April 2017 and "expressed a desire to speak to [him] about the case." Dratel Rule 33 Decl. ¶ 4, ECF No. 123; Rule 33 Mot. at 9. Mr. Dratel explains, according to Amina, "she reached out in order to notify [Mr. Dratel] of false testimony by vital prosecution witnesses Seemab Asghar and Rukhsana Kousar." Rule 33 Mot. at 9. Amina's declaration, dated June 28, 2017, is attached as Exhibit 4 to Mr. Dratel's declaration in support of Petitioner's Rule 33 motion. Amina Decl., Ex. 4 to Dratel Rule 33 Decl., ECF No. 123-4. Petitioner argues Amina's declaration supports his motion for a new trial in several ways.
Petitioner states "[a]ccording to Amina, and contrary to Seemab Asghar's testimony *837 at trial ... Seemab Asghar did not take public transportation from school the afternoon of February 25, 2013" because "this would have been inappropriate for women in her family." Rule 33 Mot. at 9 (citing Amina Decl. ¶¶ 2-3). During trial, Seemab testified she typically "use[d] the local van, public transport" to get to school, Tr. at 139, and she took the public van home after school on February 25, 2013, id. at 150. Amina states in her declaration that "Seemab Asghar always took the bus driven by Manzoor Ahmed to and from school. My cousin, Aisha Akmal, has informed me that she rode that bus with Seemab Asghar every day." Amina Decl. ¶ 2.
Amina also claims she knows "from personal experience that Seemab Asghar's testimony about the time line the day of the killings was false." Id. ¶ 5. Specifically, Amina states in her declaration, "[a]ccording to the transcript, Seemab Asghar testified she got to the bus stop at around 1:30 p.m., that the shooting took place some minutes after 2:30 p.m., and that she was still on her way home at that time. However, it does not take an hour to walk from the bus stop to the village and her house. That walk is only about half an hour." Id. Petitioner argues this information "renders impossible Seemab Asghar's and Rukhsana Kousar's claim(s) that they arrived in time to see the shooters - a conclusion shared by the Pakistani judge's findings at Mazhar Iqbal's trial." Rule 33 Mot. at 10.
In addition, Petitioner argues information in Amina's declaration regarding an alleged land ownership dispute involving Asghar, Rukhsana's husband, "would have further impeached Ms. Kousar, and corroborated the defense position that Mr. Asghar was in danger from other sources who might have been responsible for the killings." Id. During trial, when asked during cross-examination whether her husband and family were "involved in a dispute over the ownership of certain land in the village," Rukhsana denied having any knowledge about the existence of a dispute, any police reports or court orders regarding the alleged dispute, and threats made to her in connection with the alleged dispute. Tr. at 833-34. In her declaration, Amina claims she has "heard Rukhsana Kousar talk about needing to repay creditors, and that Asghar did not have the money to build the family home in Pakistan, and therefore borrowed money to do so." Amina Decl. ¶ 6.
During trial, Amina was also asked about a rumor involving the daughter of Aslam, an individual who lived in Chiryawala, who allegedly ran away. Tr. at 565. Amina testified the rumor was "[t]hat she run away and she's been killed." Id. at 566. In Amina's declaration, Amina purports to clarify that the source of this rumor-specifically, that Aslam's daughter (one of Amina's cousins) was killed because she abandoned an arranged marriage in Pakistan-was Shujat, who "assured [Amina] she had been killed." Amina Decl. ¶ 7; Rule 33 Mot. at 10. Petitioner argues Shujat "had a rather considerable vested interest in scaring Amina away from her family." Rule 33 Mot. at 10.
C. Analysis
As discussed more fully infra , to the extent any of the evidence Petitioner raises in his Rule 33 motion actually constitutes newly discovered evidence, the evidence does not warrant a new trial when considered individually and in the aggregate. Petitioner fails to meet his heavy burden of demonstrating that its introduction would likely result in an acquittal, as the law requires. Owen , 500 F.3d at 87-88 ; Gilbert , 668 F.2d at 96 ("Most pertinently, the new evidence must be such that it would probably lead to an acquittal." (citations *838 omitted) ). Given the overwhelming evidence of guilt presented during trial, this Court has no "real concern that an innocent person may have been convicted." Ferguson , 246 F.3d at 134 (citation omitted). There are no "extraordinary circumstances" present here such that "letting a guilty verdict stand would be a manifest injustice." Id. (citing and quoting United States v. Sanchez , 969 F.2d 1409, 1414 (2d Cir. 1992) ). Petitioner's emphasis on the Pakistani proceedings-which have no bearing on the outcome in this case-is misplaced, particularly considering the evidence and testimony presented during Petitioner's trial was not presented during the Pakistani proceedings. Accordingly, this Court will not disturb the jury's unanimous verdict. The Court addresses the evidence Petitioner raises in his motion in turn.
1. The Report Zimni
Petitioner argues the Report Zimni identifies seven witnesses who would testify that neither Akmal nor Babar were present at the scene of the killings of Asghar and Madeeha, and identifies seven other witnesses who could verify that Babar was staying with his uncle at the time of the killings. Rule 33 Mot. at 5-6; Reply Memo at 20-22. Petitioner also argues "cell site location evidence" described in the Report Zimni confirms that Babar was hundreds of miles away from the location of the killings. Rule 33 Mot. at 6; Reply Memo at 22-23.
With respect to the purported alibi witnesses identified in the Report Zimni, Petitioner fails to satisfy his burden of proving that the proffered testimony of these witnesses is newly discovered. The Second Circuit has "long held that in order to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence could not with due diligence have been discovered before or during trial." Forbes , 790 F.3d at 408-09 (quotation marks and citation omitted); United States v. Natelli , 553 F.2d 5, 7 (2d Cir. 1977). Here, trial counsel's declaration reveals the defense team not only called several Pakistani witnesses at trial, but was aware of and considered calling additional alibi witnesses. Sosinsky Decl. at 4-6. Additionally, an April 3, 2013 defense letter regarding bail identified four alibi witnesses who provided the defense team with affidavits. ECF No. 126-16 at 8-9. Significantly, as Petitioner acknowledges, three of the witnesses identified in the Report Zimni were known to the defense team prior to trial. Rule 33 Mot. at 13 n.8. Petitioner's argument that this evidence was unavailable during trial because "the Pakistani investigation was ongoing and the trials did not occur until Fall 2014," id. at 12, is unavailing, particularly in light of the aforementioned documents demonstrating the defense team's awareness of potential alibi witnesses. In short, because Petitioner fails to show that he could not have identified the witnesses mentioned in the Report Zimni prior to or during trial with due diligence, the proffered testimony is not newly discovered evidence.
Moreover, even if the testimony of these witnesses were newly discovered within the meaning of Rule 33, it would be cumulative of other evidence the defense presented during trial. Evidence is cumulative if it "is simply additional evidence to that which was presented at trial as to a fact, [rather than] unique evidence that tends to prove a fact at issue." White , 972 F.2d at 21 (citation omitted). Petitioner contends that the testimony of the witnesses identified in the Report Zimni is not merely impeaching but "refutes the substance of the government's case, as it contradicts the government's version of *839 the events themselves." Rule 33 Mot. at 16. However, as described supra , the defense team called three witnesses who contradicted the version of the events as described by Seemab and Rukhsana, whose testimony Petitioner argues "provided the prosecution's case with the essential links between Mr. Choudhry in Brooklyn and the events in Pakistan." Id. The testimony of these purported alibi witnesses, even assuming they are able to testify, would be cumulative because the proffered testimony is "simply additional evidence to that which was presented at trial." White , 972 F.2d at 21. Accordingly, the proffered testimony of the purported alibi witnesses identified in the Report Zimni does not constitute a basis to grant a new trial.
The cell site data regarding the location of Babar does not compel a different result. As an initial matter, Petitioner has not demonstrated this information is newly discovered. Petitioner fails to explain why this information was not available to Petitioner through the exercise of due diligence prior to or during trial. While it may be true that the Pakistani investigation and trials were ongoing during the time of Petitioner's trial, Petitioner fails to explain why this information could not have been discovered independently from the Pakistani proceedings. Even if it were newly discovered evidence, Petitioner fails to meet his burden of establishing it would likely have resulted in an acquittal. The cell site data pertains to a single co-conspirator, Babar, when the Government presented evidence that Babar was only one of several individuals involved in and present during the killings. Accordingly, the Report Zimni does not provide a basis for a new trial.
2. October 2, 2014 Bail Order
Petitioner's argument regarding Ashfaq's October 2, 2014 bail order made in the Pakistani courts, Ex. 2 to Dratel Rule 33 Decl. ("Bail Order"), ECF No. 123-2, is also unavailing. Petitioner contends the information contained in this document-that Ashfaq had initially been denied bail pending trial-would have undermined "the subtext of the government's claim that Mr. Choudhry's family was sufficiently powerful politically in Pakistan that any witnesses exculpating him or the others alleged to have been involved could not be trusted, and that his family controlled the investigation by authorities in Pakistan." Rule 33 Mot. at 7; see also Reply Memo at 25. As an initial matter, Petitioner fails to establish the document's admissibility, and newly discovered evidence is not material if it is inadmissible. United States v. Parker , 903 F.2d 91, 102 (2d Cir. 1990). Even if the document were deemed admissible, Petitioner fails to satisfy his burden of demonstrating it "would probably lead to an acquittal." Id. at 102 (quotations and citations omitted). At bottom, the Bail Order indicates one of Petitioner's co-conspirators was initially denied bail but subsequently released on bail. See Bail Order ¶ 6 (releasing Ashfaq on bail "subject to his furnishing bail bonds"). Notably, the Bail Order indicates the police initially made a "request for the discharge" of Ashfaq (which was denied), and also indicates his co-conspirators were released on bail.[7] Id. Moreover, as Petitioner's trial counsel explained, "emphasizing to a jury that named perpetrators were imprisoned pretrial for crimes they were accused of committing hardly seemed the stuff a jury would look favorably upon." Sosinsky Decl.
*840 at 8. Accordingly, the Bail Order does not warrant a new trial.
3. Judge Kharian's Summary from Mazhar Iqbal's Trial
As discussed supra , Petitioner points to two portions of a document that he claims was prepared by a Pakistani judge-Additional Sessions Judge Kharian-in connection with the trial of Mazhar Iqbal, Ashfaq's co-defendant. Rule 33 Mot. at 7-8 (citing Ex. 3 to Dratel Rule 33 Decl. at 3, 10, ECF No. 123-3). With respect to the summary of the testimony of Asif Akhter Naqash, the draftsman who created the sketch of the scene of the killings, Petitioner fails to show how this document, or testimony from the draftsman about the location of drains, contradicts Seemab's testimony regarding the location of Madeeha's body after the killings. Seemab testified that "[t]here was a drain close to the wall[, and Madeeha's] body was on the drain." Tr. at 158. Judge Kharian's summary of the draftsman's testimony-which states it is "incorrect that there is a drain in the middle of the street.... [T]here are two drains available on both side[s] of the street," Dratel Rule 33 Decl. Ex. 3 at 3 (ECF pagination)-does not contradict Seemab's testimony. Indeed, Seemab's testimony is consistent with Judge Kharian's summary, and Government's Trial Exhibit 806, which Seemab testified depicted her father's body in the street after the killings and which she used to indicate the location of her sister Madeeha's body in relation to her father's body, see Tr. at 166, also shows a drain on both sides of the street, see Ex. D to Gov't Opp., ECF No. 136-4. In short, proffered testimony that is consistent with the testimony presented during trial is neither material nor likely to result in an acquittal, and does not warrant a new trial.
Petitioner's arguments regarding Judge Kharian's statement that Asghar "had his enmity with different people," and "[i]t is correct that Mohammad Afzal etc. have their political rivalry and enmity with influential persons," Dratel Rule 33 Decl. Ex. 3 at 10 (ECF pagination), also miss the mark. While the summary prepared by Judge Kharian itself may not have been available until after Petitioner's trial, Petitioner fails to show that evidence of Asghar's hostilities and Afzal's political rivalries could not have been discovered with the exercise of due diligence prior to or during trial. In fact, Rukhsana was asked on cross-examination about a land dispute involving her husband and family, including whether she was aware of a police complaint, court order, and threats made to her concerning the land dispute. Tr. at 833-34; see also Sosinsky Decl. at 3 ("[T]he undersigned at trial questioned Rukhsana Kousar concerning this very issue [of the land dispute involving Asghar to show the possibility of an alternative perpetrator] and she disclaimed any knowledge of the dispute."). Moreover, in a recorded telephone call between Amina and Petitioner on February 25, 2013-the day of the killings-Petitioner stated, "[t]here are hundreds of people involved.... They blame us, it could be someone else." Gov't Ex. C at 45; see also Sosinsky Decl. at 3 ("On this issue of others with potential motives to do Asghar harm ... were statements made by Mr. Choudhry in the final recorded conversation he had with his daughter in which he told her a number of times that there were many others who would have wanted to do harm to Asghar, to whom he owed sums of money and who were falsely blaming her family for the murders."). Thus, neither evidence of Asghar's hostilities nor Petitioner's family's political rivalries constitutes newly discovered evidence.
Even if this evidence could be considered newly discovered, it still does not warrant a new trial. As just described, the *841 possibility of an alternative perpetrator with a motive to harm Asghar was adequately explored during trial, and any additional evidence on this topic would be merely cumulative of evidence presented during trial. Furthermore, evidence of Petitioner's family's political rivalries is not material and not likely to result in an acquittal in light of the overwhelming evidence of Petitioner's guilt. Accordingly, this evidence does not warrant a new trial.
4. Amina's Declaration
As an initial matter, Petitioner argues the information Amina provides in her declaration was unavailable during trial, and therefore constitutes newly discovered evidence, because "Amina was a government witness to whom the defense, despite requests, did not have any access." Rule 33 Mot. at 13 (citation omitted). According to Petitioner, it was only from Amina's review of the trial transcripts that the information contained in her affidavit became available to Petitioner. Id. at 13-14. However, Petitioner has failed to offer any explanation as to why the information Amina provides in her declaration was not available during trial, either through cross-examination of Amina or through other sources. As described more fully infra , much of this information was presented to the jury during trial, further undermining any argument that it constitutes newly discovered evidence. Petitioner's trial counsel was free to ask Amina about any of the topics raised in her declaration, which contains various assertions regarding Seemab's mode of transportation to and from school, the length of time it takes to walk from Seemab's bus stop to her home, whether Asghar owed money to any creditors who may have had a motive to harm him, and a rumor regarding a relative who had allegedly been killed for abandoning an arranged marriage, among other items. Amina Decl. ¶¶ 2-7.
To the extent Petitioner argues the newly discovered evidence is Amina's assertion that Seemab and Rukhsana did not testify truthfully, her observations constitute impeachment evidence that is not material and does not warrant a new trial. "Evidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." United States v. Wong , 78 F.3d 73, 79 (2d Cir. 1996) (quotations and citations omitted). "However, new impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." Id. (quotations and citations omitted); see also United States v. Orena , 145 F.3d 551, 559 (2d Cir. 1998) ("It is well settled that where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." (citations omitted) ).
During trial, Petitioner's trial counsel thoroughly challenged the credibility of Seemab and Rukhsana through cross-examination and through other witnesses and evidence. Addressing Petitioner's contention that he should have called certain additional witnesses, Petitioner's trial counsel explained the defense had called "three witnesses, none of them related to or having friendships with defendant's family, who collectively, if believed, established that Rukhsana's and Seemab's sworn claims to the jury about having been eyewitnesses to the slayings of Muhammad and Madeeha Asghar were false." Sosinsky Decl. at 4; see also id. at 5 ("[T]he defense also introduced a translated police report *842 from the date of the murders which placed both Rukhsana and Seemab at a different location from that at which they claimed to have observed the shootings. Thus, through the unbiased and independent witnesses we had presented, the jury had before it evidence which, combined with what we argued was an implausible story about what transpired immediately after the shooting, allowed them to conclude that they had not heard the truth from the Government's witnesses about that date."); United States v. Middlemiss , 217 F.3d 112, 122-23 (2d Cir. 2000) (district court did not abuse discretion in denying Rule 33 motion in part because the claimed newly discovered evidence was "additional impeachment evidence"). Furthermore, Seemab and Asghar did not provide the only evidence of Petitioner's guilt. As described in detail, the Government presented additional, overwhelming evidence of Petitioner's guilt. Accordingly, Amina's assertions regarding alleged false testimony are immaterial and do not warrant a new trial.
The information itself in Amina's declaration is cumulative of other evidence presented during trial and is immaterial. With regard to Amina's statements concerning Seemab's transportation to and from school, as noted previously, Petitioner called Manzoor Ahmed as a witness, who testified that in 2012 and 2013, including on February 25, 2013, he drove a private van which he used to transport Seemab, among other students, to and from school. Tr. at 1265-75. Amina's observation that Seemab "would not take public transportation" and Seemab "always took the bus driven by Manzoor Ahmed to and from school," Amina Decl. ¶¶ 2-3, is thus cumulative of evidence presented to the jury during trial.[8] Moreover, Amina's assertion that she does, in fact, know Manzoor, and that "[t]here are many people named Manzoor in Pakistan," Amina Decl. ¶ 4, is immaterial.
Similarly, Amina's assertion that Seemab's version of the timeline of events on the day of the murders could not be true, Amina Decl. ¶ 5, was thoroughly explored during trial. Seemab testified it takes "around half an hour" to walk from the location of the bus stop to home, she arrived at the bus stop on February 25, 2013 at approximately 1:35 P.M., and the murders occurred at approximately 2:30 P.M. Tr. at 193, 198-200, 204. Petitioner's trial counsel cross-examined Seemab regarding her recollection of the timeline of events. See, e.g., id. at 193-204. Indeed, as this Court noted during the cross-examination, "[i]t's clear what the testimony is and what the testimony was. [Seemab] said it was approximately 1:30. It took her somewhere between 20, 30 minutes to walk." Id. at 203. Accordingly, additional evidence on this point would be cumulative.
Amina asserts in her declaration that Rukhsana "lied" when she testified regarding any debts owed by Asghar to creditors. Amina Decl. ¶ 6. As a preliminary matter, to the extent Petitioner seeks to use Amina's statement regarding what she heard Rukhsana allegedly say to show the possibility of an alternative perpetrator-which Petitioner acknowledges, Reply Memo at 26-it is hearsay, and therefore inadmissible and immaterial. On that basis alone, it does not warrant a new trial. Even if this statement were admissible, and even if Asghar did owe money to creditors, this evidence is immaterial in light of the overwhelming evidence of Petitioner's guilt. The fact that Asghar may *843 have owed money to creditors is simply not a basis to grant a new trial, particularly given that the theory of an alternative perpetrator was already before the jury.
Indeed, trial counsel thoroughly cross-examined Rukhsana regarding an alleged land dispute and threats related to that dispute. Tr. at 833-34; Sosinsky Decl. at 3. Trial counsel showed Rukhsana a document concerning the topic of "the dispute over land and threats and guns that are contained within the document" in an attempt to refresh her recollection, which it did not. Tr. at 837, 840; see Sosinsky Decl. at 3 ("The fact is that the undersigned at trial questioned Rukhsana Kousar concerning this very issue and she disclaimed any knowledge of the dispute, even, as I recall, after being shown a copy of the very documents in question."). Notably, Petitioner's argument that this information "would have further impeached Ms. Kousar," Rule 33 Mot. at 10, is itself an acknowledgment that Rukhsana's credibility was already impeached-indeed, as discussed supra , Petitioner's trial counsel offered ample evidence to impeach Rukhsana's credibility during trial, and Amina's statement would be merely "an additional basis for doing so" and therefore "cumulative and hence immaterial." Orena , 145 F.3d at 559. Thus, this evidence is immaterial when used as either substantive or impeachment evidence, even assuming it is admissible.
The final issues Amina raises in her declaration regarding the source of a rumor about a relative who had allegedly been killed for abandoning an arranged marriage, the conduct of government agents during Amina's consensually recorded calls with Petitioner, and Amina's intentions regarding returning to her family's home in Brooklyn, Amina Decl. ¶¶ 7-9, are all immaterial and do not warrant a new trial. They do not, in any conceivable way, establish that their introduction to the jury would probably have led to an acquittal.
When considering a Rule 33 motion for a new trial, "[t]he controlling issue generally is the effect the evidence would have on the jury's verdict if it had been submitted at trial." Middlemiss , 217 F.3d at 122 (citation omitted). Indeed, "[g]ranting Rule 33 motions is not favored and is done with great caution." Id. (citation omitted). At bottom, Amina's affidavit fails to raise any issue that, if presented to the jury, would likely have resulted in an acquittal, and Petitioner therefore fails to meet his "ultimate burden." DiMattina v. United States , 949 F.Supp.2d 387, 397 (E.D.N.Y. 2013) (Weinstein, J.) (citing Owen , 500 F.3d at 88 ). Moreover, in the judgment of this Court, it does not raise "a real concern that an innocent person may have been convicted." Ferguson , 246 F.3d at 134 (citation omitted). Accordingly, because neither Amina's affidavit nor any of the other alleged newly discovered information would likely have resulted in an acquittal, Petitioner's motion for a new trial is denied.
II. Petition Pursuant to 28 U.S.C. § 2255
A. Legal Standard
Pursuant to Title 28, section 2255, a prisoner who is in federal custody may move the court that imposed the sentence to vacate, set aside, or correct the sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). " Section 2255 provides a mechanism for federal prisoners to vacate sentences imposed in violation of the laws or Constitution of the United States."
*844 Hardy v. United States , 878 F.2d 94, 96 (2d Cir. 1989). Although usually collateral review will not be afforded to claims a petitioner has failed to properly raise on direct review unless the petitioner can show good cause or actual innocence, that rule does not apply to claims for ineffective assistance of counsel, which "may appropriately be raised for the first time in a § 2255 motion, whether or not the petitioner could have raised the claim on direct appeal." Harrington v. United States , 689 F.3d 124, 129 (2d Cir. 2012) (quotation marks and citations omitted).
In Strickland v. Washington , the U.S. Supreme Court set forth the relevant law governing claims for ineffective assistance of counsel. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on a claim for ineffective assistance of counsel, a petitioner must satisfy Strickland 's two part test, which requires demonstrating (1) that counsel's performance was deficient, i.e. , "that counsel's representation fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defense, meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial." Id. at 687-88, 104 S.Ct. 2052 ; Bennett v. United States , 663 F.3d 71, 84 (2d Cir. 2011) ("[I]n order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he must show that counsel's performance was deficient, so deficient that, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance, and (2) he must show that the deficient performance prejudiced the defense, in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotation marks omitted) (citing Strickland , 466 U.S. at 687, 690, 694 ) ). " Strickland 's standard, although by no means insurmountable, is highly demanding." Kimmelman v. Morrison, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). The defendant bears the burden of proof on both prongs, id. at 381, 106 S.Ct. 2574, and the court must consider counsel's alleged errors in the aggregate, see Lindstadt v. Keane , 239 F.3d 191, 199 (2d Cir. 2001).
Under the first prong of Strickland , "[j]udicial scrutiny of counsel's performance must be highly deferential.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland , 466 U.S. at 689, 104 S.Ct. 2052 (quotation marks and citation omitted). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." Kimmelman , 477 U.S. at 381, 106 S.Ct. 2574. Under the second prong, to show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." Strickland , 466 U.S. at 694, 104 S.Ct. 2052. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder *845 would have had a reasonable doubt respecting guilt." Id. at 695, 104 S.Ct. 2052.
A claim for ineffective assistance of counsel "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." Bennett , 663 F.3d at 85 (citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland , 466 U.S. at 697, 104 S.Ct. 2052 ; see Brown v. Artuz , 124 F.3d 73, 80 (2d Cir. 1997) (declining to remand to the district court because, even if the petitioner raised an issue on the performance prong, the petitioner failed to establish prejudice under the second Strickland prong); Strouse v. Leonardo , 928 F.2d 548, 556 (2d Cir. 1991) ("[The petitioner] points to several instances in his trial where he asserts his lawyer's performance was objectively unreasonable. We need not address these alleged deficiencies because we conclude that [the petitioner] cannot satisfy the second prejudice prong of Strickland , given the overwhelming evidence of guilt adduced at trial.").[9]
B. Analysis
As set forth in detail below, Petitioner has not met his high burden of establishing he received the ineffective assistance of trial or appellate counsel. Even when counsel's alleged errors are considered in the aggregate, Petitioner fails to establish deficient performance of either trial or appellate counsel, nor can Petitioner establish prejudice given the overwhelming evidence of his guilt. See Strouse , 928 F.2d at 556 ; United States v. Hurtado , 47 F.3d 577, 584 (2d Cir. 1995) ("[T]he evidence of [appellant's] guilt was overwhelming, and he would therefore be unable to establish prejudice." (citation omitted) ); United States v. Simmons , 923 F.2d 934, 956 (2d Cir. 1991) (even assuming counsel's unreasonable performance, "given the plethora of evidence against [appellant], there is little reason to believe that alternative counsel would have fared any better").[10] This Court first analyzes Petitioner's claims regarding trial counsel and then *846 analyzes Petitioner's claims regarding appellate counsel.
1. Trial Counsel
a. Purportedly Exculpatory Evidence
i. Correspondence with U.S. Embassy
Petitioner argues trial counsel's failure to offer a February 2013 email exchange between Petitioner and the United States Embassy in Pakistan into evidence constituted ineffective assistance of counsel. 2255 Pet. at 17; Ex. 2 to the Decl. of Joshua Dratel in Supp. of 2255 Pet. ("Dratel 2255 Decl."), ECF No. 126-2. In the email exchange, Petitioner-writing from the email address of his son, Shakeel-alleged Shujat was "trying his level best to come to USA by hook and by crook" and stated Shujat had a "henious [sic ] criminal record" and escaped from the custody of authorities in the UAE. Ex. 2 to Dratel 2255 Decl. at 2-3, ECF No. 126-2. Petitioner wrote he had "come to know that [Shujat] have developed [sic ] friendship/close relationship with" Amina. Id. at 2. Petitioner argues this email exchange-which occurred around the same time as the murders of Asghar and Madeeha-shows that "rather than engaging in a conspiracy to kill members of Shujat Abbas's family, Mr. Choudhry was instead communicating with the U.S. government, through proper channels, seeking assistance in securing the safety of his daughter from someone he believed did not have salutary purposes in aiding her departure from Pakistan." 2255 Pet. at 19; see also Reply Memo at 2-3. Petitioner argues these emails would have provided the jury with evidence that Petitioner was allegedly "using lawful means, and harbored only lawful intentions, to disengage his daughter Amina Ajmal from the influence of Shujat Abbas." Reply Memo at 2-3. Petitioner argues this email exchange is admissible to show his state of mind and "consciousness of innocence." 2255 Pet. at 19.
Petitioner's claim fails because he cannot show trial counsel's decision not to offer the email exchange into evidence was objectively unreasonable. Indeed, Petitioner's trial counsel explained that in his view-and in this Court's view too-introducing this email exchange carried the risk of "paint[ing] Mr. Choudhry as an even more devious and desperate man, hell-bent on trying anything and everything to put a stop to Shujat's relationship with his daughter." Sosinsky Decl. at 3. In trial counsel's opinion, this was particularly true given the closeness in time of this email exchange and the recordings of Amina's and Petitioner's phone conversations in which Petitioner threatened Shujat's family. Id. at 3. According to trial counsel, there was also no support for Petitioner's claim in the email exchange regarding Shujat's alleged criminal record. Id. As the Second Circuit noted in its decision on Petitioner's direct appeal, "[w]hether to offer evidence and call particular witnesses 'is peculiarly a question of trial strategy which courts will practically never second-guess.' " Choudhry , 649 F. App'x at 61 (quoting United States ex rel. Walker v. Henderson , 492 F.2d 1311, 1314 (2d Cir. 1974) ). Here, given the substantial risks to Petitioner of introducing the email exchange, trial counsel's well-reasoned decision not to offer it into evidence was certainly within the wide range of professionally competent assistance. Moreover, Petitioner cannot demonstrate prejudice given the highly inculpatory evidence implicating him in the murders. See, e.g., Strouse , 928 F.2d at 556 (no prejudice given overwhelming evidence of guilt).
ii. Documents Relating to Prior Attack on Asghar
Next, Petitioner argues trial counsel was ineffective for failing to offer into evidence Pakistani court documents allegedly related to a lawsuit filed by Asghar *847 against a neighbor in connection with a land dispute. 2255 Pet. at 19-20; Ex. 3 to Dratel 2255 Decl., ECF No. 126-3. Petitioner argues these documents "would have provided considerable proof in Mr. Asghar's own words that others had threatened him," and "the prospect of an alternative perpetrator would have been established by Mr. Asghar himself." 2255 Pet. at 20. Petitioner specifically points to a statement allegedly provided by Asghar in which he describes being threatened at gunpoint by the defendants in the lawsuit. Id. at 20 (quoting Ex. 3 to Dratel 2255 Decl.).
Although Petitioner contends his trial counsel was ineffective for failing to offer these documents into evidence, as Petitioner's trial counsel points out, Petitioner does not suggest any basis upon which these documents would be admissible. Id. at 19-20; Sosinsky Decl. at 3. Petitioner's trial counsel therefore did not act unreasonably in failing to offer into evidence inadmissible documents. Even assuming these documents were admissible, Petitioner's claim still fails. As discussed supra in the context of Petitioner's Rule 33 motion, the theory of an alternative perpetrator was presented to the jury during trial. See, e.g. , Sosinsky Decl. at 3-4; Gov't Ex. C at 45-46; Tr. at 833-34. Indeed, Petitioner himself referenced the possibility of an alternative perpetrator with a motive to harm Asghar in one of the recorded telephone calls between Amina and Petitioner. Gov't Ex. C at 45-46. Petitioner's trial counsel did not act unreasonably in failing to offer into evidence documents that were cumulative of other evidence before the jury, and in any event, Petitioner's trial counsel asked Rukhsana about the very documents in question and she denied knowledge of them. Sosinsky Decl. at 3. Similarly, Petitioner cannot show prejudice for failing to offer into evidence documents allegedly showing the possibility of an alternative perpetrator when that theory was already presented to the jury, and in light of the overwhelming evidence of Petitioner's guilt, the result would not have been different.
iii. Purportedly Exculpatory Witnesses
Petitioner argues trial counsel was ineffective for failing to call a number of purportedly exculpatory witnesses. 2255 Pet. at 20-34. According to Petitioner, these witnesses would have contradicted the testimony of Seemab and Rukhsana, who testified that members of Petitioner's family were present at the scene and committed the murders. Id. at 21.
Petitioner focuses primarily on trial counsel's decision not to call Zameer Abbas, who was driving the motorcycle on which Asghar and Madeeha were riding and who was also shot during the incident, as a witness. 2255 Pet. at 22-28; Reply Memo at 4-5. Petitioner points to two affidavits submitted in connection with Petitioner's April 2013 bail application in which Zameer states that individuals identified by Rukhsana as being present at the scene of the murders were, in fact, not there. 2255 Pet. at 23; Ex. 4 to Dratel 2255 Decl., ECF No. 126-4; Ex. 5 to Dratel 2255 Decl., ECF No. 126-5. Petitioner also cites two documents described earlier in the discussion of Petitioner's Rule 33 motion-the Report Zimni and a document prepared in connection with the Pakistani trial of Mazhar Iqbal-which summarize statements Zameer allegedly made in which Zameer denied the involvement of Petitioner's relatives in the murders. 2255 Pet. at 24-27; Ex. 7 to Dratel 2255 Decl., ECF No. 126-7; Ex. 8 to Dratel 2255 Decl., ECF No. 126-8. Petitioner further argues trial counsel's reference to Zarmeer's anticipated testimony in trial counsel's opening statement prejudiced Petitioner. 2255 Pet. at 27-28; Reply Memo at 4.
*848 "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Eisen , 974 F.2d 246, 265 (2d Cir. 1992) (citation omitted). "[C]ounsel's decision as to whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation." United States v. Best , 219 F.3d 192, 201 (2d Cir. 2000) (quotation marks and citations omitted). "[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial." Massaro v. United States , 538 U.S. 500, 505, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).
Trial counsel's declaration clearly demonstrates the decision not to call Zameer as a witness was the result of trial counsel's carefully formulated trial strategy. As Mr. Sosinsky explained:
As I recall it, at my final meeting with Zameer Abbas, I became increasingly concerned that he would not appear to be a credible witness. Most important, there was a major issue regarding an initial statement purportedly made by Zameer to the police and/or to medical/hospital personnel on the very date of the shooting. Although I was aware through our investigation that there had been such an initial report filed, we were not able to obtain this document until the eve of trial. In this statement, which Zameer had disavowed making, it was reported that the shootings occurred in essentially the same manner and involved the very same individuals as had already been testified to by Rukhsana and Seemab Asghar. When pressed over how there could have been such a fundamental discrepancy between this statement and his subsequent statements to the contrary, Zameer did not have an answer which inspired confidence in me. In addition, although Zameer was certain that none of the many (perhaps 11) named individuals claimed by Rukhsana and Seemab to have been present at the scene of the shooting were there, he was unable to describe in any detail the appearance of the shooters. This too caused me doubts about his veracity. Further, he disclaimed knowing much of anything concerning the earlier shooting of Asghar's vehicle even though it was undisputed that it was following this event that he was asked to stay at Rukhsana's house with them. In addition to concern over specific aspects of his proposed testimony, I also concluded that Zameer would likely not be a strong witness. He struck me in person as a particularly nervous young man. Since the defense had already presented testimony from three witnesses who, if believed, cast significant doubt about the Government's witnesses, it did not seem at all prudent to put on a witness who I had little faith would withstand a spirited cross-examination.
Sosinsky Decl. at 5-6. Moreover, as discussed in detail already, trial counsel presented the testimony of three witnesses whose version of events, if credited, contradicted the testimony of Rukhsana and Seemab:
To begin with, although Zameer Abbas was present in New York at the time of trial, and I had planned on, in all likelihood calling him as a witness, the final determination not to do so was made only after the defense had presented the testimony of three witnesses, none of them related to or having friendships with defendant's family, who collectively, if believed, established that Rukhsana's and Seemab's sworn claims to the jury about having been eyewitnesses to the slayings of Muhammed and Madeeha Ashgar were false. We called bus driver *849 Manzoor Ahmed who testified that he drove Seemab Asghar home from school on the date of the murders and that prior to dropping her off, he was notified by telephone that she would be met at the bus stop by police officers, which he testified, in fact occurred. The defense also called one of those police officers, Waqas Ali, who picked Seemab Asghar up at the bus stop where Manzoor had left her and brought her into the city near the crime scene well after the shootings took place. Finally, the defense introduced the testimony of school teacher Nazia Khanum (by deposition) who witnessed the shooting. Khanum testified that the murders were carried out by two unknown individuals, neither of whom was any of the many people that Rukhsana or Seemab identified as having carried out the shootings and with whom Khanum was familiar. Most significantly, Khanum testified that neither Rukhsana nor Seemab were present on the scene when the shooting took place. Rather, Khanum testified, she observed Rukhsana come down to the scene some time later where she was joined by her daughters. Additionally, the defense also introduced a translated police report from the date of the murders which placed both Rukhsana and Seemab at a different location from that at which they claimed to have observed the shootings. Thus, through the unbiased and independent witnesses we had presented, the jury had before it evidence which, combined with what we argued was an implausible story about what transpired immediately after the shooting, allowed them to conclude that they had not heard the truth from the Government's witnesses about that date.
Id. at 4-5. Mr. Sosinsky's declaration clearly demonstrates that his decision not to call Zameer as witness was not unreasonable, and trial counsel acted within the wide range of professionally competent assistance. Trial counsel's brief references to the possibility of Zameer testifying do not change the analysis and do not carry the weight Petitioner attributes to them.[11] Trial counsel made a reasoned "tactical decision" not to call Zameer despite his reference to Zameer's anticipated testimony. Sosinsky Decl. at 6. Accordingly, Petitioner cannot show he received the ineffective assistance of counsel based on trial counsel's decision not to call Zameer as a witness.
Petitioner also argues trial counsel was ineffective for failing to call a number of other purported alibi witnesses who would have allegedly refuted the testimony of the Government's witnesses. 2255 Pet. at 28-33; Reply Memo at 6-7. Again, Petitioner's claim with respect to these other witnesses fails because Petitioner's trial counsel acted more than reasonably in deciding not to call them. Trial counsel was rightfully concerned about the reliability and trustworthiness of these potential witnesses. As Mr. Sosinsky explained:
[W]hile conducting pretrial investigation, I was very much concerned with the undisputed fact that almost immediately following the murders, none of the men identified as having been involved in the murders could be located at their home or otherwise - notwithstanding that most or all later claimed to have alibis. In fact, even defense witness Waqas Ali testified that he was part of the police team that immediately went looking to arrest those men who had beer identified *850 on the spot by Rukhsana Kousar and that none, including Mr. Choudhry's brother Mohammed Akmal Choudhry, could be found at or around their residencies. Indeed, as I recall it, most of those named by Rukhsana and Seemab remained fugitives from justice in Pakistan, up through the time of the trial of Mr. Choudhry. Thus, although there were witnesses who reported to have been with Akmal at his home at the time of the shooting... given that Akmal had apparently left his home in the village shortly before the police came looking for him, an issue wholly unaddressed in any of their statements, I viewed these witnesses statements, and therefore all such "alibi" statements involving others, with more than healthy skepticism. That no one seemed to know where Akmal and others identified as participants in the murders but not yet arrested were as we prepared for trial did not engender in this lawyer greater confidence in their accounts. Moreover, the prospect of offering alibi testimony in an American courtroom regarding, in many cases, fugitives from justice in their own country was not one I would seriously entertain.
Sosinsky Decl. at 7-8. Petitioner's trial counsel acted more than reasonably in declining to call witnesses whose testimony was highly suspect. See, e.g., Weeks v. Senkowski , 275 F.Supp.2d 331, 341 (E.D.N.Y. 2003) (Weinstein, J.) (counsel's failure to call alibi witnesses was a "sound strategic choice"). Moreover, the testimony of these purported alibi witnesses would have been cumulative of the testimony provided by the witnesses Petitioner did call during trial, who refuted the version of events provided by the Government's witnesses. Petitioner fails to sustain his burden of establishing either prong of the Strickland standard for ineffective assistance of counsel.
iv. Other Purportedly Exculpatory Evidence
Petitioner's next argument is that trial counsel was ineffective for failing to (1) offer into evidence cell site data pertaining to Babar's location at the time of murders; (2) introduce court documents indicating Ashfaq, one of Petitioner's co-conspirators, was initially denied bail pending trial; (3) call the draftsman who created a sketch of the scene of the murders used in connection with the Pakistani trial of Mazhar Iqbal, Ashfaq's co-defendant; and (4) introduce evidence from Mazhar Iqbal's Pakistani trial related to Asghar's purported enemies and Afzal's alleged political rivalries. 2255 Pet. at 34-36. This Court has already rejected Petitioner's argument that this same evidence warrants a new trial. For many of the same reasons, Petitioner's claim of ineffective assistance with respect to this evidence also fails.
Even assuming their admissibility, the cell site records pertain to a single co-conspirator, and Petitioner has failed to establish a reasonable probability that the result of the trial would have been different had they been admitted. With respect to the Bail Order, it was far from unreasonable for trial counsel to have misgivings about "emphasizing to a jury that named perpetrators were imprisoned pretrial for the crimes they were accused of committing," Sosinsky Decl. at 8, and the Bail Order itself undermines the very claim Petitioner argues it supports. Petitioner's ineffectiveness claim related to the draftsman's description of the scene of the murders fails because it was completely reasonable for trial counsel not to seek to admit testimony consistent with the Government's witnesses and exhibits, nor did Petitioner suffer any prejudice as a result. Lastly, failing to introduce evidence from Mazhar Iqbal's Pakistani trial related to *851 either Asghar's alleged hostilities or political rivalries of Petitioner's family was not unreasonable and did not result in prejudice to Petitioner. At bottom, Petitioner cannot show that trial counsel acted unreasonably in failing to seek to admit this evidence, nor can Petitioner show that he suffered prejudice under Strickland .
Regarding documents and other evidence from the Pakistani trials of Petitioner's co-conspirators, Petitioner's trial counsel explained:
[W]ith respect to the trial(s) of any of the named individuals in Pakistan, the undersigned understood that the courts there did not and likely would never hear the sworn testimony of Amina Ajmal, Rukhsana Kousar or Seemab Asghar, nor would the audiotaped recordings of Mr. Choudhry's threats be presented to those tribunals. For this reason alone (and there were many others), to the undersigned, decisions made in those courts could hardly have been premised upon the same considerations as were present here. I was always guided accordingly.
Sosinsky Decl. at 9. Trial counsel's reluctance to introduce evidence related to the Pakistani proceedings was well-founded. The Pakistani proceedings in which Petitioner's co-conspirators were acquitted have no bearing on the proceedings before this Court, and were reached without all of the evidence presented to the jury in this case. Petitioner's reliance on the outcomes of those proceedings, see, e.g. , 2255 Pet. at 34 n.13, is misplaced.
b. Failure to Object
Petitioner argues trial counsel was constitutionally ineffective for failing to object to certain expert testimony from Government expert witness Professor Katherine Ewing and to certain testimony from other Government witnesses. The Court addresses Petitioner's arguments in turn.
i. Professor Ewing's Testimony
Petitioner first argues his trial counsel was ineffective for failing to object to certain parts of Professor Ewing's testimony because the testimony was either unduly prejudicial under Rule 403 and/or beyond the scope of permissible expert testimony. 2255 Pet. at 38-39. Some context is important for analyzing Petitioner's argument.
The Government initially gave notice in a June 1, 2014 letter of its intention to call "an expert witness to testify regarding the role of honor killings, arranged marriages and gender dynamics in Pakistani culture. In particular, the government expects that this witness will testify regarding the frequency and typical circumstances of such honor killings." ECF No. 70. In a letter dated June 4, 2014, the Government identified Professor Katherine Ewing, a "trained anthropologist and professor of religion at Columbia University, [whose] fields of specialization include anthropological approaches to religion; Islam and Islamization; religious movements; identity politics and postcoloniality, ethnicity and migration; gender and sexuality; and cultural and social theory," as the expert it anticipated calling to testify at trial. ECF No. 72. Also on June 4, 2014, Petitioner's trial counsel filed a motion in limine seeking to preclude Professor Ewing's testimony. ECF No. 73. On June 6, 2014, the Government filed a response to the defense's motion in limine , in which it provided a detailed summary of Professor Ewing's anticipated testimony. ECF No. 76 at 2-3. During a June 9, 2014 pretrial conference, this Court denied the defense's motion to preclude the expert testimony. Gov't Ex. E (Transcript of June 9, 2014 Pretrial Conference) at 28-30, ECF No. 136-5. Petitioner's trial counsel objected again to the Government's motion to certify Professor *852 Ewing as an expert during trial, which the Court overruled.[12] Tr. at 657-58.
With this important background, it is clear Petitioner's claim must fail. Petitioner acknowledges his trial counsel filed a motion in limine , but nonetheless argues the motion "did not represent fulfillment of [trial counsel's] obligation to monitor the individual answers during the expert's testimony." 2255 Pet. at 38; Reply Memo at 7. But the portions of testimony cited in Petitioner's motion fall squarely within the areas of testimony contemplated in the Government's June 6, 2014 response. See ECF No. 76 at 2-3. It would have been frivolous for trial counsel to make further objections to Professor Ewing's testimony. As Petitioner's trial counsel stated:
What Mr. Choudhry fails to acknowledge, however, is that each of the passages of Professor Ewing's testimony which he finds objectionable yet not specifically objected to in front of the jury were the subject of a detailed motion in limine made just prior to trial in which the bases for the defense's objections to such testimony were set forth - and thereafter opposed by the Government's proffer. This issue, among others, was the subject of colloquy with the Court at the final pretrial conference. And the proffered testimony was ruled admissible by the Court at that final pretrial conference, over the defense's continuing objection. Accordingly, objecting in the presence of the jury to what I knew the Court had already ruled admissible would have accomplished nothing.
Sosinsky Decl. at 9-10. Trial counsel did not act unreasonably in failing to make frivolous objections that would have been overruled. See, e.g., United States v. Cohen , 427 F.3d 164, 170 (2d Cir. 2005) ("[T]he failure ... to raise an otherwise futile objection could not have rendered counsel ineffective." (citations omitted) ); United States v. Nersesian , 824 F.2d 1294, 1322 (2d Cir. 1987) ("Counsel certainly is not required to engage in the filing of futile or frivolous motions." (citation omitted) ); United States v. Reeves , 02-CV-9309, 96-CR-325, 2005 WL 3288012, at *8 (S.D.N.Y. Dec. 2, 2005) (Preska, J.) ("The failure to make demonstrably futile arguments cannot constitute constitutionally ineffective assistance of counsel.").
Petitioner also argues his trial counsel should have cross-examined Professor Ewing. 2255 Pet. at 44; Reply Memo at 7; see Tr. at 687. Again, this argument fails because trial counsel's decision not to cross-examine Professor Ewing was a sound strategic decision. As Petitioner's trial counsel explained:
As to the claim that I should have cross-examined Professor Ewing, it is notable that counsel does not suggest even a single area of inquiry that might have proved fruitful. In the end, that decision not to cross-examine this witness was borne of an evaluation by counsel that inasmuch as Professor Ewing, as she stated, was not testifying about or with knowledge of the particular circumstances present in the case on trial, it was the better course of action to have her leave the witness stand sooner than later.... If I believed based on what I knew, that there was likely to be helpful information elicited on cross, I would have certainly attempted to get it from her.
Sosinsky Decl. at 10. In his reply, Petitioner asserts it would have been "useful" for trial counsel to "reinforce for the jury"
*853 during cross-examination that Professor Ewing's testimony was not based on her knowledge of the facts of the case. Reply Memo at 7. But as Petitioner implicitly acknowledges, this was already established on direct examination, as Professor Ewing stated in response to the Government's own questions that she had not directly participated in the Government's investigation of the case and had not reviewed any of the Government's evidence. Tr. at 656. At a minimum, it was certainly within the wide range of professionally competent assistance not to seek to cross-examine Professor Ewing regarding this previously-established point, notwithstanding Petitioner's contention that it would have been "useful." Accordingly, because trial counsel did not act unreasonably, Petitioner's ineffective assistance of counsel claim fails.
ii. Objections to Other Testimony
Next, Petitioner argues his trial counsel was ineffective for failing to object on hearsay and Rule 403 grounds to certain testimony by Seemab, Amina, and other Government witnesses. 2255 Pet. at 44-47. Petitioner's arguments are meritless.
First , Petitioner argues his trial counsel should have objected on hearsay grounds to the portions of Seemab's testimony during which Seemab testified that Amina told her Babar "is so shorter than me and my family wanted me to marry him." Id. at 44 (citing Tr. at 70). This statement is not hearsay because it was not being offered to prove the truth of the matter asserted, but rather was offered to show Amina's understanding of her family's wishes. It would have been pointless for trial counsel to object. Even if it were hearsay and trial counsel should have objected, Petitioner cannot show prejudice.
Second , Petitioner argues his trial counsel should have objected to Seemab's testimony regarding statements made by Javed as inadmissible hearsay. Id. at 44-45 (citing Tr. at 91, 127). But Petitioner's trial counsel did object to these statements both pre-trial and again during trial. Specifically, trial counsel objected to the Government's pre-trial motion to admit co-conspirator statements, see ECF No. 74 at 1-2, and the Court overruled those objections, see Gov't Ex. E at 14. During trial, Petitioner's counsel again objected when Seemab testified regarding Javed's statements. Tr. at 79-80, 90-91, 126-27. To the extent Petitioner is now arguing trial counsel should have objected again , any further objection would have been frivolous.[13]
Third , Petitioner argues his trial counsel was ineffective for failing to object on Rule 403 grounds to Seemab's testimony regarding the January 2013 attack on her family's car and Amina's fear of her uncle in Pakistan. 2255 Pet. at 45-46. Regarding Seemab's testimony about the January 2013 attack, there was other, overwhelming evidence of Petitioner's family's involvement, including Petitioner's own statements in consensually recorded calls (see Gov't Ex. C at 11) and Rukhsana's testimony. Accordingly, it is meritless to argue Petitioner suffered prejudice within the meaning of the Strickland test as a result of the admission of this testimony. With respect to Seemab's testimony concerning the bullet holes in the family car, the Government introduced into evidence a photograph in which bullet holes are clearly visible. See Gov't Ex. F, ECF No. 136-6. Moreover, in light of the overwhelming *854 evidence of Petitioner's guilt, it is implausible to suggest there is a reasonable probability the outcome would have been different had Seemab's testimony regarding her anger or Amina's testimony regarding being fearful not been admitted.[14]
Fourth , Petitioner argues trial counsel should have renewed his objection to Amina's testimony regarding a rumor she heard about a cousin who fled an arranged marriage. 2255 Pet. at 46-47 (citing Tr. at 565-66); Reply Memo at 8-9. Petitioner also argues trial counsel should have provided a more specific basis for the objection. 2255 Pet. at 46-47; Reply Memo at 8-9. As Petitioner concedes, trial counsel did , in fact, object to this testimony. See Tr. at 565-66 ("Mr. Sosinsky: Objection, Judge, to rumor."). It would have been pointless to object again given that the Court already overruled trial counsel's objection, and it certainly was not unreasonable for trial counsel not to renew his objection or articulate another basis for the objection. Although Petitioner argues trial counsel should have objected to this testimony on the basis of hearsay, as the Government notes, it was not eliciting the rumor for its truth, but rather to show Amina's state of mind, and it was also relevant for that purpose. See Gov't Opp. at 41. The testimony was therefore not hearsay. Moreover, Petitioner has not come anywhere close to meeting his burden of showing prejudice within the meaning of Strickland with respect to this testimony. The notion that Petitioner's trial may have turned out differently if the jury never heard this brief testimony strains credulity given all of the evidence of Petitioner's guilt.
Regarding Petitioner's claim that he should have objected more often, Petitioner's trial counsel stated:
As for Mr. Choudhry's claim that I should have objected more often during the testimony of Amina Ajmal, Rukhsana and Seemab, and by failing to do so, I somehow failed to prevent the admission of otherwise inadmissible evidence (Choudhry Memorandum in Support, pp. 44-47), my recollection is that I objected regularly throughout the trial and argued outside the presence of the jury on a number of occasions regarding the basis for objections that were overruled. I do not believe that had I objected to any of the challenged testimony, the Court would have sustained a single objection.
Sosinsky Decl. at 10. This Court agrees. Petitioner's claims that his trial counsel was constitutionally ineffective for failing to object more are meritless, and Petitioner cannot come close to showing that there is a reasonable probability the outcome would have been different even if trial counsel had objected more.
c. Failure to Cross-Examine Witnesses
Petitioner argues trial counsel was ineffective for failing to more thoroughly cross-examine Seemab, Rukhsana, and a witness from Western Union. 2255 Pet. at 48-50. Once again, Petitioner fails to establish either prong of Strickland , and his claim fails.
First , Petitioner argues trial counsel should have cross-examined Seemab more extensively regarding "important subjects." 2255 Pet. at 49. "Decisions about 'whether to engage in cross-examination, and if so to what extent and in what *855 manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." Dunham v. Travis , 313 F.3d 724, 732 (2d Cir. 2002) (quoting Nersesian , 824 F.2d at 1321 ). Notably-as Petitioner acknowledges-the Second Circuit deemed trial counsel's cross-examination of Seemab "extensive." Choudhry , 649 F. App'x at 61 ; 2255 Pet. at 49. Petitioner fails to specify precisely what subject or subjects trial counsel neglected to explore during cross-examination in his motion, nor does he identify those subject or subjects in his reply memorandum. As Petitioner's trial counsel noted, "[Petitioner] does not even recite what it is that counsel purportedly neglected to question [Seemab] about.... What is clear is that the request was to ask a single additional question." Sosinsky Decl. at 11. Petitioner's failure to identify precisely what subject or subjects trial counsel neglected to pursue on his extensive cross-examination of Seemab is fatal to his claim.
Second , Petitioner argues trial counsel failed to sufficiently cross-examine Rukhsana regarding "essential issues," including a Pakistani police report which was later admitted into evidence. 2255 Pet. at 49. Again, as Petitioner acknowledges, the Second Circuit categorized trial counsel's cross-examination of Rukhsana as "extensive." Choudhry , 649 F. App'x at 61 ; 2255 Pet. at 49. With respect to the police report at issue, trial counsel explained:
Mr. Choudhry points to the trial court's decision denying me the opportunity to conduct limited re-cross examination of the witness regarding a translated Pakistani police report. The report, provided to the defense either on the eve of or during the trial, purported to place Rukhsana and Seemab in a location different than where they testified to having been during the fatal attack on the family. While I neglected to confront the witness with the information in this report while on cross, I recognized the omission while the witness was still on the stand and thought that the Court would permit me but a few minutes to question her on this. The Court did not. By the end of the case, however, the Court did permit introduction of the report itself from which I was able to argue the contradiction and to use the report as affirmative proof of the whereabouts of these witnesses.
Sosinsky Decl. at 11. Even if trial counsel's cross-examination was inadequate-which it was not-trial counsel's declaration clearly demonstrates Petitioner cannot show prejudice given that trial counsel was still able to use the report to attempt to contradict Rukhsana's testimony. Accordingly, Petitioner fails to establish either prong of Strickland .
Third , Petitioner argues trial counsel "failed to obtain or use certain records that would have assisted in cross-examination" of Peg Peterson, an employee of Western Union who testified about money Petitioner sent to relatives in Pakistan. 2255 Pet. at 49-50; Tr. at 411-30. Petitioner contends that had trial counsel obtained certain records in advance of trial, trial counsel would have been able to "categorically establish[ ] the points [trial counsel] was attempting to make." 2255 Pet. at 50; Reply Memo at 7-8. However, as trial counsel explained, he was able to establish the points he wanted to make on cross-examination without the records:
Mr. Choudhry maintains that a more lengthy cross-examination of a representative from Western Union would have helped to exonerate him. However, as can be seen from the very portion of the testimony he cites to in support of his claim, the points made on cross were simple enough: the three transactions discussed took place at times far removed from the charges in the case; and *856 while the records showed many transfers of funds to Pakistan from other family members, the witness was familiar only with those involving Mr. Choudhry.
Sosinsky Decl. at 11. Trial counsel therefore did not act unreasonably by not obtaining records to use during cross-examination, and Petitioner cannot show prejudice because, among other reasons, trial counsel was nonetheless able to establish the points he wanted to make to the jury without the documents in question.
d. Jury Charge
Petitioner next argues his trial counsel was ineffective for failing to object to the jury charge this Court provided for Count Three of the Superseding Indictment, transmission of threats to injure, in violation of 18 U.S.C. § 875(c). 2255 Pet. at 51-53. Specifically, Petitioner argues because trial counsel failed to object to the jury charge, the Second Circuit on appeal applied a "plain error" standard of review in affirming Petitioner's conviction on Count Three. Id. at 53; Choudhry , 649 F. App'x at 62. Petitioner concedes this Court's jury charge was proper at the time it was given, but was rendered erroneous by the Supreme Court's decision in Elonis v. United States , --- U.S. ----, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). See 2255 Pet. at 51-53 (noting Elonis was not decided until after Petitioner's trial).[15]
"Counsel is not required to forecast changes in the governing law." Mayo v. Henderson , 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted). Generally, courts reject claims of ineffective assistance of counsel premised on counsel's failure to forecast or predict a change in the governing law. See, e.g., Jameson v. Coughlin , 22 F.3d 427, 430 (2d Cir. 1994) ("Nor can counsel be deemed incompetent for failing to predict that the New York Court of Appeals would later overrule the Second Department's reasonable interpretation of New York law."); Alexander v. Graham , 07-CV-59, 2008 WL 4239167, at *7 (E.D.N.Y. Sept. 11, 2008) (Gershon, J.) ("[T]rial counsel was not ineffective ... for failing to foresee the change in New York [depraved indifference] law."); Muniz v. United States , 360 F.Supp.2d 574, 579 (S.D.N.Y. 2005) (Stein, J.) ("[B]ecause counsel's performance must be judged as of the time of counsel's conduct, [petitioner's] attorney cannot be deemed ineffective for failing to anticipate a potential Sixth Amendment challenge as alleged in Booker ." (citing Mayo , 13 F.3d at 533 ) ); Pena v. United States , 04-CV-9700, 00-CR-36, 2005 WL 1176073, at *6 (S.D.N.Y. May 18, 2005) (Peck, M.J.) (noting "[g]enerally, counsel is not ineffective for failing to forecast a change in the law" and collecting cases), aff'd , 534 F.3d 92 (2d Cir. 2008) ; Marino v. United States , 97-CV-1884, 89-CR-341, 1997 WL 714879, at *3 (S.D.N.Y. Nov. 17, 1997) (Patterson, J.) ("Counsel's failure to predict a change in the law does not constitute a performance falling below objectively reasonable professional standards."); see also Lilly v. Gilmore , 988 F.2d 783, 786 (7th Cir. 1993) ("The Sixth Amendment does not require counsel to forecast changes or advances in the law, or to press meritless arguments before a court." (citation omitted) ).
*857 As these cases make clear, it was not unreasonable for trial counsel to fail to object to a jury charge that was, at the time given, consistent with governing Second Circuit law. See Sosinsky Decl. at 12 ("[C]ounsel relied upon the then-prevailing law in the Second Circuit which utilized the reasonable person standard in evaluating a defendant's intent.").
Even if Petitioner could establish trial counsel's deficient performance for not objecting to the jury charge at issue-which he cannot-Petitioner also fails show prejudice. As the Second Circuit explained in Petitioner's direct appeal:
Based on the record before us, we have no doubt that a rational jury, properly instructed, would have found that Choudhry had subjective intent to issue a threat or knowledge that his communication would be viewed as a threat. For instance, the evidence included, inter alia, recorded conversations in which Choudhry stated to his daughter Amina, "Until I find you nothing is going to stop. I'm going to kill their whole family.... I will keep shooting at them, until you come back home ... I will kill myself and also make sure I kill all of them." Choudhry further stated, "If you don't come back, I will kill each and every one of them. I will go to jail," and explained, "we had to threaten them ... in order to have them bring you back to us."
Choudhry , 649 F. App'x at 63 (citations omitted). Accordingly, because Petitioner cannot show his trial counsel acted unreasonably or that he suffered prejudice given the overwhelming strength of the evidence against him, Petitioner's final claim alleging ineffective assistance of trial counsel fails.
2. Appellate Counsel
Petitioner argues his appellate lawyer, Ms. Ying Stafford, was ineffective for (1) failing to raise certain viable issues on appeal; (2) making arguments that lacked merit; (3) making certain erroneous statements; and (4) failing to file a reply brief. 2255 Pet. at 53-54.
The same Strickland standard applies to claims of ineffective assistance of appellate counsel. See Smith v. Murray , 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) ; Claudio v. Scully , 982 F.2d 798, 803 (2d Cir. 1992) ("Although Strickland addressed the constitutional standard for ineffective assistance of counsel in the trial counsel context, our Circuit has also adopted the Strickland two-prong test in assessing the effectiveness of appellate counsel." (citation omitted) ). Appellate counsel does not have a duty to raise every colorable issue that could be made. Jones v. Barnes , 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ; Mayo , 13 F.3d at 533 ("[C]ounsel does not have a duty to advance every nonfrivolous argument that could be made." (citation omitted) ). A petitioner who "shows that [appellate] counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker" can establish ineffective assistance of appellate counsel. Mayo , 13 F.3d at 533. The Court now addresses Petitioner's claims of ineffective assistance of appellate counsel.[16]
a. Failure to Raise Purportedly Meritorious Issues
First , Petitioner argues appellate counsel should have raised this Court's admission of Professor Ewing's testimony in Petitioner's appellate brief. See 2255 Pet. at 55-56; Reply Memo at 10. Petitioner argues *858 Professor Ewing's testimony was "as objectionable and unduly prejudicial as it appeared it would be from the government's notice," and appellate counsel's failure to raise this issue on appeal constituted ineffective assistance of counsel. 2255 Pet. at 56. This claim fails because appellate counsel reasonably chose to focus on other issues she believed were more important. See, e.g., Lugo v. Kuhlmann , 68 F.Supp.2d 347, 372 (S.D.N.Y. 1999) (Patterson, J.) ("[R]eviewing courts should not second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues." (citing, inter alia, Jones , 463 U.S. at 754, 103 S.Ct. 3308 ) ). Indeed, as Petitioner's appellate counsel explained:
[A]lthough the testimony of Professor Ewing was strongly litigated - her testimony in the end was hardly prejudicial compared with the other evidence in the case. In fact, Professor Ewing testified that arranged marriages could be dissolved without violence and that divorce was an even [sic ] an option. Had Mr. Choudhry's consensual recordings with his daughter not been so devastating the introduction of Professor Ewing's testimony might have been highly prejudicial and a more attractive issue on appeal. Unfortunately, it was Mr. Choudhry's repeated statements and not Professor Ewings' [sic ] testimony that made clear to the jury what it meant to Mr. Choudhry that his daughter had shamed him - he was going to continue to kill until she returned.
Stafford Decl. ¶ 5, ECF No. 136-2. Moreover-as Petitioner's appellate counsel noted, see id. ¶ 5 n.1-the Second Circuit has repeatedly affirmed the admission of similar expert testimony to provide important context and background for jurors. See, e.g., United States v. Kaziu , 559 F. App'x 32, 38-39 (2d Cir. 2014) (upholding district court's decision to allow expert testimony regarding "how al-Shabaab and al-Qaeda distribute their propaganda through 'media wings,' and how outsiders' familiarity with such material facilitates their assimilation into terrorist groups"); United States v. Farhane , 634 F.3d 127, 158-60 (2d Cir. 2011) (upholding district court's decision to allow expert testimony regarding "al Qaeda's history and structure" and terrorist activities in Saudi Arabia); United States v. Mejia , 545 F.3d 179, 190 (2d Cir. 2008) (noting "an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group" and citing Dang Vang v. Toyed , 944 F.2d 476, 481-82 (9th Cir. 1991), in which the Ninth Circuit "uph[e]ld[ ] the district court's admission of expert testimony on Hmong culture," as support); United States v. Matera , 489 F.3d 115, 121-22 (2d Cir. 2007) (upholding district court's decision to allow expert testimony regarding "the composition and structure of New York organized crime families"); United States v. Feliciano , 223 F.3d 102, 109, 120-22 (2d Cir. 2000) (rejecting challenges to testimony of expert witness who testified regarding "the structure, leadership, practices, terminology, and operations of Los Solidos [a gang]"). Accordingly, Petitioner's appellate counsel did not act unreasonably in failing to raise this Court's admission of Professor Ewing's testimony.
Second , Petitioner argues his appellate counsel should have raised this Court's admission of Amina's testimony regarding the rumor that another woman in her family had been killed for fleeing an arranged marriage. 2255 Pet. at 56-57; Tr. at 565-66. Petitioner argues it should have been excluded on the basis of hearsay. 2255 Pet. at 56-57. As already discussed, this testimony was not hearsay because it was not offered to show the truth of the matter asserted, but rather to show Amina's state of mind. Moreover, as already discussed, this brief portion of testimony is *859 not nearly as significant or material as Petitioner contends, and Petitioner fails to show that he suffered prejudice within the meaning of Strickland given the overwhelming evidence of Petitioner's guilt.[17] Petitioner therefore fails to satisfy either prong of Strickland with respect to this claim.
Third , Petitioner argues his appellate counsel "failed to present any relevant case law pertaining" to the argument raised in Point I of Petitioner's appellate brief, which contains Petitioner's argument that he was denied his due process rights by this Court's treatment of witnesses and purported display of bias. 2255 Pet. at 57. This claim is contradicted by the brief filed by Ms. Stafford, which does, in fact, cite case law. See, e.g. , Ex. G to Gov't Opp. ("Pet.'s App. Br.") at 11, ECF No. 136-7. As Petitioner's appellate counsel explained:
Mr. Choudhry argues that Point I of the brief was inadequate because it did not present any "relevant" case law. That simply is not true [as] there is case law in the brief. The case law provided by Mr. Choudhry in his petition are hardly relevant because they are distinguishable to Mr. Choudhry's case. The trial record did not reflect that the Court in displayed [sic ] the level of bias that is delineated in the cases cited by Mr. Choudhry. Thus, to include the cases cited by Mr. Choudhry would only have served [to] diminish the argument in Point I.
Stafford Decl. ¶ 7; see also, e.g., Felton v. Mazzuca , 98-CV-4567, 2012 WL 4462009, at *9 (S.D.N.Y. Sept. 27, 2012) (Sullivan, J.) ("Although Petitioner argues that counsel should have cited to specific decisions, none of those cases have any bearing on the specific facts of Petitioner's case...."). Petitioner cannot establish ineffective assistance of counsel by pointing to additional cases he now wishes his appellate counsel had cited in the brief. At bottom, appellate counsel's argument in Point I of the brief was more than constitutionally sufficient, and Petitioner's claim fails.
b. Alleged Mistakes and Errors in the Appellate Brief
Next, Petitioner argues he received ineffective assistance of appellate counsel based on several alleged mistakes and errors in the appellate brief. 2255 Pet. at 59-62. Petitioner's claims are without merit.
First , Petitioner claims appellate counsel was ineffective for arguing certain testimony from defense witness Nazia Khanum had not been admitted when, in fact, that testimony was admitted. Id. at 59-60. As an initial matter, this was a minor and secondary point on appeal, and the Second Circuit devoted a single sentence to discussing it. See Choudhry , 649 F. App'x at 61 ("In fact, one of the items, the testimony of Nazia Khanum, was admitted into evidence by stipulation and referred to in defense counsel's summation."). Even if it was unreasonable for appellate counsel to make this assertion on appeal, Petitioner has failed to make any viable argument that he was prejudiced as a result. There is simply no basis to conclude there is a reasonable probability Petitioner's appeal *860 may have turned out differently has this argument been omitted.
Second , Petitioner asserts his appellate counsel was ineffective for arguing this Court refused to admit certain other evidence-such as the February 2013 email exchange with the U.S. Embassy in Pakistan-when, in fact, trial counsel did not seek to introduce this evidence. 2255 Pet. at 60. As to the email exchange with the U.S. Embassy, appellate counsel explicitly acknowledged in the appellate brief that this evidence was "unfortunately not presented" during trial, thereby undermining Petitioner's argument. Pet.'s App. Br. at 15; Stafford Decl. ¶ 8. Moreover, appellate counsel explained Petitioner "was very adamant about including the evidence that trial counsel had not admitted at trial and the issue of the Court displaying bias. I did my best to include the argument regarding evidence that was not admitted without raising a claim of ineffective assistance of counsel." Stafford Decl. ¶ 23. Petitioner cannot now complain his lawyer was ineffective for following his instructions. See United States v. Wellington , 417 F.3d 284, 289 (2d Cir. 2005) (citations omitted). In any event, even if Petitioner could show deficient performance, he certainly cannot show a reasonable probability of a different outcome on appeal, particularly because there is no indication the Second Circuit penalized Petitioner for the inclusion of this argument regarding evidence not admitted during trial.
Third , Petitioner argues his appellate counsel applied the wrong standard of review regarding this Court's jury charge for Count Three of the Superseding Indictment, transmission of threats to injure, in violation of 18 U.S.C. § 875(c). 2255 Pet. at 61. Appellate counsel argued a de novo standard of review applied even though Petitioner's trial counsel did not object to the jury charge during trial. 2255 Pet. at 61; Pet's App. Br. at 25. "Where a defendant has preserved his claim of error by a timely objection calling the district court's attention to the problem when the court would have the opportunity to fix the error, we review a district court's jury charge de novo , and will vacate a conviction for an erroneous charge unless the error was harmless. But where ... a defendant fails to make a timely objection, we review the instruction for plain error." United States v. Nouri , 711 F.3d 129, 138 (2d Cir. 2013) (citations omitted). Petitioner states that "bereft of any argument by Mr. Choudhry that the concededly erroneous instruction constituted plain error, the Second Circuit concluded in its Summary Order that '[n]otwithstanding the erroneous jury instruction, ... Choudhry has not established plain error." 2255 Pet. at 61 (quoting Choudhry , 649 F. App'x at 63 ). Petitioner's claim of ineffective assistance fails because Petitioner cannot show prejudice. As already discussed, the Second Circuit concluded "we have no doubt that a rational jury, properly instructed, would have found that Choudhry had subjective intent to issue a threat or knowledge that his communication would be viewed as a threat." Choudhry , 649 F. App'x at 63. Even if appellate counsel had argued the correct standard of review, there is no reason to believe the Second Circuit would have reached a different conclusion. Accordingly, because Petitioner cannot show a reasonable probability of a different outcome on appeal, Petitioner's claim fails.
Fourth , Petitioner argues his appellate counsel was constitutionally ineffective because instead of raising certain issues, appellate counsel "instead raised certain claims that lacked merit entirely, and which did not even warrant discussion by the [Second Circuit] in its Summary Order." 2255 Pet. at 61-62. This Court has already concluded appellate counsel was not constitutionally ineffective for failing *861 to raise the purportedly viable arguments Petitioner references, and courts should not second-guess appellate counsel's reasonable decisions regarding which claims to pursue. See Lugo , 68 F.Supp.2d at 372 (citations omitted). Petitioner's argument is based on the Second Circuit's conclusion that it "considered all of the defendant-appellant's remaining arguments and find them to be wit lout merit." 2255 Pet. at 62; Choudhry , 649 F. App'x at 63. Indeed, numerous Second Circuit summary orders include the same or similar conclusion. The Second Circuit's decision not to engage in a detailed discussion of all of the arguments appellate counsel raised does not, by any means, support a finding that appellate counsel acted unreasonably in raising those arguments.
c. Failure to File a Reply Brief
Next, Petitioner argues appellate counsel was constitutionally ineffective for failing to file a reply brief. 2255 Pet. at 62-64. Petitioner argues a reply brief would have provided an opportunity to address and/or correct the purported errors in the brief appellate counsel filed. Id. With respect to the filing of a reply brief, Petitioner's appellate counsel explained Petitioner and his family wanted the brief to be reviewed by another lawyer prior to filing, and she sent the brief to Petitioner's son and Petitioner's trial counsel for their review but heard nothing from Petitioner or his son after receiving an extension of time to file from the court. Stafford Decl. ¶¶ 24-26. To the extent Petitioner now alleges appellate counsel was ineffective for failing to file a reply brief when appellate counsel was simply following Petitioner's instructions, Petitioner's claim fails. See Wellington , 417 F.3d at 288 ("[T]o the extent that defendant instructed his counsel to pursue a course of action that defendant now complains of, there was no abridgement-constructive or otherwise-of defendant's Sixth Amendment right to effective assistance of counsel." (citations omitted) ).
In his reply, Petitioner devotes several pages to describing alleged falsehoods in appellate counsel's declaration regarding the filing of a reply brief and cites several documents he alleges support his argument. Reply Memo at 11-14. Petitioner argues, inter alia , appellate counsel's statement that she needed Petitioner's permission to file a reply brief is untrue. Id. at 11. Although Petitioner cites several emails between his son and Ms. Stafford, see Reply Memo at 11 & Ex. 3 to Reply Memo, ECF No. 140-3, none of those emails directly contradict Ms. Stafford's statement that Petitioner instructed her not to file a reply until Petitioner and/or other counsel signed off on it. In any event, even if what Petitioner alleges is true, he cannot show prejudice. Petitioner argues a reply brief could have (1) cited to certain portions of the testimony of Manzoor Ahmed; (2) cited additional case law; and (3) provided a "plain error" analysis regarding the jury charge on Count Three. 2255 Pet. at 62-64. But Petitioner fails to adequately explain why his appeal would have turned out differently even if his appellate counsel had raised these issues in a reply brief. Accordingly, because there is not a reasonable probability of a different outcome on appeal, Petitioner's claim regarding the reply brief fails. See, e.g., Washington v. Walsh , 10-CV-7288, 2015 WL 4154103, at *28 (S.D.N.Y. July 9, 2015) (Sullivan, J.) (finding appellate counsel not ineffective for failing to file a reply brief when the contemplated reply would not have raised meritorious issues); Smalls v. McGinnis , 04-CV-301, 2004 WL 1774578, at *32 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.) (dismissing claim of ineffective assistance for failure to file a reply brief because petitioner did not demonstrate that *862 filing a reply brief would have changed the outcome of his appeal).
Petitioner also devotes several pages of his reply to describing appellate counsel's alleged deficient performance and false statements with respect to a Rule 33 new trial motion that appellate counsel was retained to file on Petitioner's behalf. Reply Memo at 14-20; see also 2255 Pet. at 64 n.28. To the extent Petitioner argues appellate counsel's failure to file the Rule 33 motion constitutes ineffective assistance of counsel, this claim fails because Petitioner cannot show prejudice. Petitioner has filed a timely Rule 33 motion describing alleged newly-discovered evidence, as discussed extensively in this decision. Accordingly, Petitioner cannot make any viable argument that he suffered prejudice within the meaning of Strickland by appellate counsel's failure to file.
CONCLUSION
For the reasons set forth above, Petitioner's Rule 33 motion for a new trial and petition to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 are DENIED. Petitioner has failed to establish the legal requirements for a new trial and has failed to establish he received the ineffective assistance of either trial or appellate counsel. The Clerk of Court is respectfully directed to terminate the pending motions.
SO ORDERED.

The wedding ceremony is called a "nikkah." Id. at 510.

Immediately preceding this statement, Amina asked her father about the "[b]ullets that you have shot at them." Gov't Ex. C at 11. Amina testified she was referring to the bullets that were shot at Shujat's parents' car. Tr. at 571.

Special Agent Danny Lee testified that ending his shift at 10:32 P.M. New York time on February 24, 2013 (the night before the murders) resulted in a "significantly shorter trip, shorter shift than [Petitioner] typically had." Tr. at 1047-48.

A district court has discretion in deciding whether to hold a hearing in the context of a Rule 33 motion for a new trial. See United States v. Sasso , 59 F.3d 341, 350 (2d Cir. 1995) (citation omitted). "No hearing is required on a new trial motion if '[t]he moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing.' " United States v. Helmsley , 985 F.2d 1202, 1209-10 (2d Cir. 1993) (quoting United States v. Slutsky , 514 F.2d 1222, 1226 (2d Cir. 1975) ). Where an evidentiary hearing would not help the court to resolve disputed issues, it is not necessary to hold one. United States v. White , 972 F.2d 16, 22 (2d Cir. 1992) (citation omitted). Here, Petitioner's submissions clearly demonstrate he is not entitled to relief, and this Court finds an evidentiary hearing is unnecessary.

In his reply memorandum, Petitioner attaches documents that he asserts are Babar's cell records described in the Report Zimni. See Ex. 8 to Reply Memo, EOF No. 140-8; Reply Memo at 22-23.

Petitioner also argues that "vitiation of Seemab Asghar's credibility with respect to her whereabouts at the time of the shooting would have dispositively undermined Ms. Kousar's similar claim (since she and Seemab Asghar were together at the time)." Rule 33 Mot. at 8.

Indeed, it could be argued this document undermines the very claim Petitioner argues it supports.

Amina's statement regarding what her cousin, Aisha Akmal, allegedly informed her is inadmissible hearsay and therefore not material. Parker , 903 F.2d at 102 (citations omitted). And even if it were admissible, its introduction is not likely to lead to a different verdict, as Rule 33 requires for a new trial. Id. (citations omitted).

The decision of whether to hold an evidentiary hearing is within the discretion of the district court. See Pham v. United States , 317 F.3d 178, 184 (2d Cir. 2003) (citing Chang v. United States , 250 F.3d 79, 85-86 (2d Cir. 2001) ). Having presided over Petitioner's trial and based on the parties' submissions and the declarations of Petitioner's trial and appellate counsel, and because Petitioner's motion and the records of this case conclusively show Petitioner is not entitled to relief, this Court concludes an evidentiary hearing is not needed. See 28 U.S.C. § 2255(b) ; Puglisi v. United States , 586 F.3d 209, 213 (2d Cir. 2009) ; United States v. Wilson , 146 F.Supp.3d 472, 483 (E.D.N.Y. 2015) (Kuntz, J.) (no evidentiary hearing necessary because, among other reasons, the court presided over petitioner's trial, was in full possession of the trial record, and the petitioner's motion and case records conclusively showed petitioner was not entitled to relief); Brown v. United States , 03-CV-3909, 03-CV-4371, 2010 WL 2594640, at *11-12 (E.D.N.Y. June 23, 2010) (Dearie, C.J.) ("Having presided over petitioners' seven-week trial, and based on the submissions of petitioners, [petitioner's] counsel, and the government's lead trial attorney, the Court determines that no hearing is required.").

Petitioner also argues the cumulative effect of counsel's alleged errors rendered his trial and appeal "fundamentally unfair." Reply Memo at 19-20. For the reasons discussed in this decision, this Court disagrees. See, e.g., Joyner v. Miller , 01-CV-2157, 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (Pauley, J.) (rejecting habeas petitioner's cumulative effect claim because alleged errors were not actually errors, and in any event, petitioner could not show prejudice because his trial was not fundamentally unfair).

As the Government notes, it did not reference Zameer not testifying during its closing arguments, and when this issue was raised by trial counsel prior to closing arguments, the Government indicated it did not intend to make any reference to the fact that Zameer did not testify. Gov't Opp. at 34; Tr. at 1372-73.

Notably, Petitioner acknowledges his "objections to the expert testimony in its entirety were well-preserved by trial counsel, who had submitted a pretrial motion in limine to preclude testimony on the subjects of honor killings, arranged marriages and gender dynamics in Pakistani culture." 2255 Pet. at 55 (quotation marks and citation omitted).

Petitioner also argues his trial counsel should have objected to Rukhsana's testimony regarding statements made by Naseem Ajmal (Petitioner's sister). 2255 Pet. at 45 (citing Tr. at 707-08). But the Court already overruled trial counsel's objections regarding co-conspirator statements, and like with Seemab's testimony, further objection would have been frivolous.

The same is true regarding Petitioner's claim with respect to Nayab Asghar's testimony about her fear. See 2255 Pet. at 46 n.20.

As the Second Circuit explained in Petitioner's direct appeal, the Supreme Court in Elonis held that the mental state required for a conviction under 18 U.S.C. § 875(c) is that the defendant "transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," and not merely "that a reasonable person would regard [the] communications as threats." Choudhry , 649 F. App'x at 62-63 (quoting Elonis , 135 S.Ct. at 2012 ).

The parties agree the proper relief for a petitioner who establishes ineffective assistance of appellate counsel is reinstatement of the direct appeal. See Reply Memo at 9 n.2; Gov't Opp. at 44 n.10.

Although the section of Petitioner's brief in which this argument appears is captioned "The Admission of Hearsay" and focuses on the purported admission of "clearly prejudicial inadmissible hearsay testimony," Petitioner also argues this testimony did not have any probative value and should have been excluded pursuant to Rule 403, and his appellate counsel was ineffective for failing to raise this argument. 2255 Pet. at 56-57. The testimony was relevant to show Amina's state of mind and for the reasons already stated, Petitioner cannot show prejudice. Accordingly, this argument has no merit.